IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No. 39536-7-III |
| | ) | |
| LYLE ROETCISOENDER, JR., | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | UNPUBLISHED OPINION |

COONEY, J. — Through this personal restraint petition (PRP), Lyle Roetcisoender Jr. challenges the sentence imposed following his 1988 conviction for first degree kidnapping, committed when he was 16 years old. Mr. Roetcisoender asserts his sentence is unconstitutional because (1) it imposed a life sentence on a juvenile offender for a nonhomicidal offense, (2) was ordered without consideration of his age, and (3) failed to explicitly set a minimum term of confinement. Mr. Roetcisoender also contends the judgment and sentence is invalid on its face because it imposed an indeterminate life sentence with no minimum term in violation of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW.

We disagree with Mr. Roetcisoender's arguments and hold that RCW 9.94A.730 is an adequate alternative remedy because it eliminates the claimed constitutional infirmity. Accordingly, we deny Mr. Roetcisoender's petition.

BACKGROUND

The facts underlying Mr. Roetcisoender's conviction are largely immaterial as this PRP challenges his sentence, not his conviction. In short, on July 29, 1987, Mr. Roetcisoender abducted a two-and-a-half-year-old girl from her front yard. He was 16 years old at the time of the offense. Under a nearby bridge, Mr. Roetcisoender "beat her in the head with rocks and also beat her head against rocks," molested her, and left her "naked and unconscious under the water of the stream flowing under the bridge by wedging her left foot in a crevice so that her body and head trailed in the current under water." Br. of Pet'r, Ex. 6 at 1.

Mr. Roetcisoender was charged with first degree kidnapping and second degree attempted murder. While awaiting trial, Mr. Roetcisoender had two mental health evaluations that revealed severe cognitive limitations. According to school records provided to the psychologist, Mr. Roetcisoender had "been in special education since the first grade," and his academic performance was at or below the fifth-grade level near the time he committed the offenses. Br. of Pet'r, Ex. 3 at 1.

Following a jury trial, Mr. Roetcisoender was found guilty of first degree kidnapping and not guilty of second degree attempted murder. However, the jury returned a guilty verdict on the lesser included crime of second degree assault.

On March 22, 1988, Mr. Roetcisoender was given an exceptional sentence of life imprisonment on the first degree kidnapping charge and 14 months on the second degree assault charge. The court further ordered:

> The defendant shall be educated to the fullest extent of the State of Washington while incarcerated. He shall receive such psycho-therapeutic treatment as is available and appropriate in the Department of Corrections to rehabilitate him during his incarceration. When there is convincing evidence of the defendant's rehabilitation, the subject of his release may be addressed as provided by the law related to commutations and pardons, by the Clemency and Pardons Board, provided the defendant has served a minimum term of 108 months, including credit for time served of 234 days.

Br. of Pet'r, Ex. 5 at 3.

In ordering an exceptional sentence, the trial court found that during the commission of the kidnapping, Mr. Roetcisoender's conduct (1) "manifested a deliberate cruelty to the victim," (2) that he "knew that the victim was particularly vulnerable and incapable of resistance due to her age and body size," and (3) "under operation of the multiple offense policy," the presumptive sentence would be "clearly too lenient in light of the purposes of the [SRA]." Br. of Pet'r, Ex. 6 at 3. The sentencing court found no mitigating factors.

3

Mr. Roetcisoender appealed his convictions on June 22, 1989. This court affirmed.

In 2021, confusion arose among staff at the Department of Corrections (DOC) regarding Mr. Roetcisoender's eligibility to petition for early release pursuant to RCW 9.94A.730. The confusion was based on Mr. Roetcisoender being designated in the DOC's system as serving a life sentence. The DOC inquired of the Washington Attorney General's Office (AGO) whether Mr. Roetcisoender could petition for release under RCW 9.94A.730 or whether a resentencing was necessary. Although the AGO noted that the court "should have imposed a specific amount of months or years, not just 'life'" and that it was not "clear . . . whether this specific order has any legal effect," the AGO nevertheless opined Mr. Roetcisoender was eligible to petition for release under RCW 9.94A.730. Reply Br. of Pet'r, Ex. 1 at 8.

The DOC followed the AGO's guidance and deemed Mr. Roetcisoender eligible to petition for release under RCW 9.94A.730. However, Mr. Roetcisoender's efforts to petition for release were thwarted because the DOC had listed "LIFE" as his minimum term and his early release date. Reply Br. of Pet'r, Ex. 1 at 4. To resolve the issue, the DOC arbitrarily changed Mr. Roetcisoender's minimum term from life to 999 years.

In June 2022, after serving "approximately 409 months plus 234 days of jail time," Mr. Roetcisoender was given a hearing before the Indeterminate Sentence Review Board

4

No. 39536-7-III
*In re PRP of Roetcisoender, Jr.*

(ISRB) in accordance with RCW 9.94A.730. Supp. Br. of Pet'r, Ex. 1 at 1, 3. At the

conclusion of the hearing, the ISRB found:

> Based on the burden of proof set out in RCW 9.94A.730 and the totality of
> evidence and information provided to the Board, the Board does find by a
> preponderance of the evidence that Mr. Roetcisoender is more likely than
> not to commit any new criminal law violations if released on conditions.
> Consequently, the Board finds Mr. Roetcisoender not releasable. Mr.
> Roetcisoender can re-submit a petition for review in 48 months.

Supp. Br. of Pet'r, Ex. 1 at 1. The ISRB denied release, citing: (1) Mr. Roetcisoender's

failure to participate in the Sex Offender Treatment Assessment Program,

(2) Mr. Roetcisoender's significant mental health problems "related to his crime of

conviction and a potential risk of re-offense," (3) Mr. Roetcisoender experiencing a great

deal of anxiety over moving to a "more open living unit," (4) Mr. Roetcisoener

demonstrating no insight into offending behavior, and (5) the unlikeliness that conditions

of release would sufficiently reduce the risk of Mr. Roetcisoender reoffending. Supp. Br.

of Pet'r, Ex. 1 at 2. The ISRB recommended referring Mr. Roetcisoender to sex offender

treatment as soon as possible and allowed him to petition for release again in June 2026.

ANALYSIS

Mr. Roetcisoender brings a collateral challenge to his life sentence through this

PRP. A PRP is an extraordinary form of relief that requires the petitioner to "meet a high

standard before this court will disturb an otherwise settled judgment." *In re Pers.*

*Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). A PRP petitioner who had

5

a "prior opportunity for judicial review must show that they were actually and substantially prejudiced by constitutional error or that their trials suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice." *Coats*, 173 Wn.2d at 132; *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 299, 88 P.3d 390 (2004); *Cook*, 114 Wn.2d at 810-12. These standards are grounded in the court's interest in economy, finality, and integrity of the trial process, and the petitioner's prior access to judicial review. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315, 440 P.3d 978 (2019).

Moreover, a PRP will only be granted "if other remedies which may be available to the petitioner are inadequate under the circumstances." RAP 16.4(d). Here, among other arguments, the State asserts that RCW 9.94A.730 provides Mr. Roetcisoender an adequate alternative remedy. To constitute an adequate alternative remedy under RAP 16.4(d), RCW 9.94A.730 must mitigate or eliminate the error identified by the petitioner. *See In re Pers. Restraint of Ali*, 196 Wn.2d 220, 244-45, 474 P.3d 507 (2020).

JUVENILE LIFE SENTENCE

Mr. Roetcisoender asserts the sentence is unconstitutional because it imposed a life sentence against a juvenile offender, was entered without consideration of his age, and failed to explicitly set a minimum term of confinement.

After Mr. Roetcisoender filed this PRP, the Washington State Supreme Court decided *In re Pers. Restraint of Hinton*, 1 Wn.3d 317, 525 P.3d 156 (2023). In *Hinton*,

17-year-old Mr. Hinton shot two people, killing one and seriously injuring the other. *Id.* at 321. Mr. Hinton was tried as an adult and later convicted of second degree murder and attempted second degree murder. *Id.* at 322. Through a PRP, Mr. Hinton challenged his 37-year adult sentence, arguing it violated the Eighth Amendment to the United States Constitution because it did not comply with the constitutional mandate of *Houston-Sconiers*.[1] *Id.* at 325. In rejecting Mr. Hinton's arguments, the Supreme Court held that only *Houston-Sconiers*'s substantive rule applies retroactively on collateral review and, even if the sentencing court violated *Houston-Sconiers*'s substantive rule, RCW 9.94A.730 was an adequate alternative remedy. *Id.* at 324.

In *Houston-Sconiers*, the Supreme Court created the substantive rule that courts may not impose "certain adult sentences . . . on juveniles who possess such diminished culpability that the adult standard SRA ranges and enhancements would be disproportionate punishment." *Ali*, 196 Wn.2d at 239. "Substantive rules" are rules that "'set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose' including a prohibition against "'a certain category of punishment for a class of defendants because of their status or offense.'" *Id.* at 237 (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016)).

---

[1] *State v. Houston-Sconiers*, 188 Wn.2d 139, 1 P.3d 409 (2017).

To effectuate the substantive rule, *Houston-Sconiers* also established the procedural rule that "sentencing courts must consider the mitigating qualities of youth and have discretion to impose sentences below what the SRA mandates." *Id.* On collateral review, a new rule is only given retroactive application if it is a new substantive rule of constitutional law. *Hinton*, 1 Wn.3d at 329. "'New procedural rules do not apply retroactively on . . . collateral review.'" *Id.* (quoting *Edwards v. Vannoy*, 593 U.S. 255, 141 S. Ct. 1547, 1560, 209 L. Ed. 2d 651 (2021)).

Although, here, *Houston-Sconiers*'s substantive rule would apply retroactively, the State argues we should deny Mr. Roetcisoender's PRP because RCW 9.94A.730 has resolved any constitutional defect in his original sentence by converting Mr. Roetcisoender's life sentence to a 20-year to life sentence. Accordingly, the State claims Mr. Roetcisoender has an adequate alternative remedy that precludes relief through a PRP. We agree with the State.

RCW 9.94A.730 grants those sentenced to lengthy prison terms as juveniles the right to petition the ISRB for early release after serving at least 20 years. RCW 9.94A.730(1); *In re Pers. Restraint of Dodge*, 198 Wn.2d 826, 839, 502 P.3d 349 (2022). At the hearing, the ISRB "shall order the person released" unless it "determines by a preponderance of the evidence that . . . it is more likely than not that the person will commit new criminal law violations if released." RCW 9.94A.730(3); *Dodge*, 198 Wn.2d at 841. Should the ISRB deny an offender release, the offender may file "a new

8

petition for release five years from the date of denial or at an earlier date as may be set by the [ISRB]." RCW 9.94A.730(7).

Like *Hinton*, RCW 9.94A.730 has effectively remedied Mr. Roetcisoender's alleged violation of *Houston-Sconiers*'s substantive rule. The only mandatory portion of Mr. Roetcisoender's sentence is the minimum 20-year term set by RCW 9.94A.730. Any additional time Mr. Roetcisoender serves beyond the minimum term is a period of incarceration directly tied to his rehabilitation. *In re Pers. Restraint of Forcha-Williams*, 200 Wn.2d 581, 599, 520 P.3d 939 (2022). Mr. Roetcisoender's life sentence has been converted to an indeterminate sentence of 20 years to life, specifically designed for juvenile offenders. RCW 9.94A.730 is an adequate alternative remedy to Mr. Roetcisoender's claimed constitutional violation.

EXHAUSTION OF THE ALTERNATIVE REMEDY

Mr. Roetcisoender disagrees that RCW 9.94A.730 is an adequate alternative remedy because he has already been denied release by the ISRB and cannot make a new petition until 2026. Because he is ineligible to immediately petition the ISRB, Mr. Roetcisoender contends that he has exhausted all alternative remedies other than a PRP. We disagree.

Mr. Roetcisoender confuses his *availability* for release with *actual* release. We will only grant relief by a PRP if other remedies are inadequate under the circumstances. RAP 16.4(d). As discussed above, if the ISRB denies an offender

9

release, RCW 9.94A.730(7) entitles the offender to "file a new petition for release five years from the date of denial or at an earlier date as may be set by the board." Here, the ISRB authorized Mr. Roetcisoender to file a new petition in June 2026, 48 months from the denial of his petition for release. With an anticipated hearing in June 2026, Mr. Roetcisoender has an adequate remedy available under his unique circumstances.

FACIAL INVALIDITY OF JUDGMENT AND SENTENCE

Mr. Roetcisoender next argues that his judgment and sentence is invalid on its face because it violates the SRA. Specifically, Mr. Roetcisoender posits that former RCW 9.94A.120(3)[2] (1987) required that all sentences outside the standard range be determinate sentences. He directs us to the definition of "determinate sentence" found in former RCW 9.94A.030(10)[3] (1987). This statute defines a "determinate sentence" as one that "states with exactitude the number of actual years, months, or days of total confinement." RCW 9.94A.030(10)[4] (1987). Mr. Roetcisoender argues he was given an indeterminate sentence because his sentence of life without parole does not state with exactitude the actual number of years, months, or days of confinement.

---

[2] Recodifed as RCW 9.94A.505 (LAWS OF 2011, ch. 338).

[3] Recodifed as RCW 9.94A.030(18) (LAWS OF 2011, ch. 338).

[4] Recodifed as RCW 9.94A.030(18) (LAWS OF 2011, ch. 338).

10

A judgment is "invalid" if the trial court exercised power that it did not have, most typically by imposing a sentence not authorized by law. *In re Pers. Restraint of Flippo*, 187 Wn.2d 106, 110, 385 P.3d 128 (2016). To prevail in a PRP on a claim that a judgment and sentence is invalid on its face based on an alleged nonconstitutional error, the petitioner must show a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007); *In re Isadore*, 151 Wn.2d at 299; *Cook*, 114 Wn.2d at 810-12. In determining whether a facial sentencing error is prejudicial, the court looks to the practical effects resulting from the error. *In re Pers. Restraint of Yates*, 180 Wn.2d 33, 41, 321 P.3d 1195 (2014).

Even if Mr. Roetcisoender could establish his life sentence is indeterminate and violative of former RCW 9.94A.120 constituting a fundamental defect, as discussed above, he is unable to demonstrate a resulting complete miscarriage of justice. RCW 9.94A.730 has effectively reduced his life sentence to an indeterminate sentence of 20 years to life. Any incarceration Mr. Roetcisoender has served beyond the minimum term is directly tied to his rehabilitation.

11

TERM OF COMMUNITY CUSTODY

Mr. Roetcisoender next argues that RCW 9.94A.730 is not an adequate alternative remedy because he would be subject to lifetime community custody even if he was released by the ISRB. We disagree.

Mr. Roetcisoender's argument is premised on the assumption that he will be subject to a lifetime of community custody once released by the ISRB. Alternatively, Mr. Roetcisoender speculates that once released from confinement, the ISRB could return him "to the institution for up to the remainder of the court-imposed term of incarceration." RCW 9.94A.730(8).

A PRP must be based on "more than speculation [or] conjecture." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). "If the ISRB grants release, the defendant is subject to Department of Corrections community custody for a period of time determined by the ISRB, up to the length of the court-imposed term of incarceration." *In re Pers. Restraint of Brooks*, 197 Wn.2d 94, 99, 480 P.3d 399 (2021).

Because Mr. Roetcisoender's term of community custody may be reduced, his claimed error is premature. Should Mr. Roetcisoender be subject to unlawful restraint through either a lifetime of community custody or returned "to the institution for up to the remainder of the court-imposed term of incarceration," his remedy is to file a PRP. RCW 9.94A.730(8). Moreover, if Mr. Roetcisoender is released by the ISRB and later returned to the institution, he would again be eligible to petition the ISRB for release

12

"five years from the date of return to the institution or at an earlier date as may be set by the board." RCW 9.94A.730(8).

## CONCLUSION

RCW 9.94A.730 is an adequate alternative remedy that eliminates Mr. Roetcisoender's claim that his sentence is unconstitutional. Additionally, even if Mr. Roetcisoender's judgment and sentence is invalid on its face, he cannot demonstrate a resulting complete miscarriage of justice because of RCW 9.94A.730. Consequently, we deny Mr. Roetcisoender's PRP.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

I CONCUR:


_____
Lawrence-Berrey, C.J.

13

No. 39536-7-III

FEARING, J. (Dissent) —

*The facts of this case are devastating and heinous, honestly.* Oral argument of Jodi Hammond, State of Washington's counsel at 18:47 to 18:53.

*The trouble with his superpredator forecast, he [John J. DiIulio, while disavowing his popularizing of the superpredator theory,] told* Retro Report*, is that "once it was out there, there was no reeling it in.* Haberman, Clyde "When Youth Violence Spurred 'Superpredator' Fear," *The New York Times* (April 6, 2014).

Disbelief, anger, and resistance met the United States Supreme Court's epochal decision in *Brown v. Board of Education of Topeka, Shawnee County, Kansas*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). State and local governments expended extraordinary efforts to ignore, skirt, and defy the high Court's ruling that integrated public schools. Lower courts and later United States Supreme Court benches designed to weaken the demands of the monumental decision.

Mistrust, skepticism, annoyance, antagonism, and defiance has also greeted the United States Supreme Court watershed opinions in *Miller v. Alabama*, 567 U.S. 460,

132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) and *Montgomery v. Louisiana*, 577 U.S. 190, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) and the Washington Supreme Court's seminal decision in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017). The State has spent exceptional efforts and formulated endless arguments envisioned to destroy the promises found in the three towering decisions. Lower courts and later Washington Supreme Court panels have fabricated specious arguments in order to dilute, if not demolish, the imperatives of the three decisions that recognize the diminished culpability of youth and disdain lengthy and sometimes lifetime punishment for the state's youth. In turn, the Washington criminal justice system rejects brain science because that science fails to support a cherished world view that crime must be punished and heinous crime must be ruthlessly punished.

This court's response to Lyle Roetcisoender's personal restraint petition represents another fissure in the teaching, promise, holdings, and mandates from *Miller v. Alabama*, *Montgomery v. Louisiana*, and *State v. Houston-Sconiers*. In 1988, Roetcisoender received a lifetime sentence with the possibility of commutation or pardon, but not parole, for first degree kidnapping and fourth degree assault committed at age 16. Roetcisoender, with an I.Q. of 65 in 1987 and 53 in 2020, has spent thirty-seven years incarcerated without any realistic chance of release.

In denying Lyle Roetcisoender relief, this court's majority, in addition to the State, fails to answer many imperative questions. What is the typical sentence meted for kidnapping? Does the law permit a youth to receive a harsher sentence for a crime than

an adult would receive?  Why, despite being a youth with an intellectual disability, did Roetcisoender receive the highest possible adult penalty?  Does the sentencing court's lifetime sentence with the possibility of pardon or commutation, but with no mention of parole, make sense?  Was the sentence imposed on Roetcisoender in 1988 a valid sentence?  If the Washington Supreme Court decision in *State v. Bassett*, 192 Wn.2d 67, 428 P.3d 343 (2018) bars a life sentence for any youth committing any crime, including aggravated first degree murder, why does Roetcisoender remain incarcerated?  Why has the State refused to follow *State v. Bassett* and strike Roetcisoender's life sentence?  What steps has the Department of Corrections (DOC) taken to rehabilitate Roetcisoender?  What must Roetcisoender accomplish to obtain release?  What treatment has DOC denied Roetcisoender because the DOC record insists that Roetcisoender is serving a life sentence with the possibility of parole?  When will Roetcisoender ever be released from prison?  Will Roetcisoender ever be released?  Is there a likelihood that Roetcisoender will spend the rest of his life in prison?  Would Roetcisoender have already been released from prison if he committed the crime as an adult?  Has any court or government agency ever considered the *Miller* factors in Roetcisoender's case when both United States Supreme Court and Washington Supreme Court cases demand resentencing based on these factors?  Would Roetcisoender have already been released under the *Miller*-fix statute if he had committed murder?  How will Roetcisoender ever gain release when his low I.Q. interferes in his treatment and rehabilitation?  What purpose is served by keeping Roetcisoender in prison other than retribution?  If

3

Roetcisoender remains a danger to the community, do other means of protecting the community exist other than caging him for the rest of his life? Would other means be less expensive and promote rehabilitation?

I agree with Lyle Roetcisoender's arguments that his 1988 sentence constitutes an unconstitutional de jure and de facto life sentence. The sentence violates the United States Constitution's Eighth Amendment cruel and unusual punishment clause in that it imposes a life sentence on a sixteen-year-old defendant with no meaningful possibility of parole and with no consideration to his age at the time of sentencing. The sentence also breaches the cruel punishment clause found in article I, section 14 of the Washington Constitution simply because it is an impermissible life sentence. In turn, I disagree with the majority that RCW 9.94A.730 presents an adequate alternative remedy. Therefore, I dissent. Roetcisoender is entitled to a meaningful resentencing before the superior court.

This dissent outlines details of Lyle Roetcisoender's prosecution, sentencing, and imprisonment, describes the motion for resentencing brought by Roetcisoender, discusses the difference between indeterminate sentences and determinate sentences, dissects the language in Roetcisoender's 1988 judgment and sentence, moves to the law controlling youth sentencing, shows that Roetcisoender is living under an unconstitutional life sentence, demonstrates that RCW 10.73.100's time bar does not bar Roetcisoender from relief, establishes that Roetcisoender lacks an adequate alternative remedy, determines that Roetcisoender is entitled to relief in a personal restraint petition, and concludes that Roetcisoender deserves resentencing before the the superior court if not immediate

4

release because of serving a de facto life sentence. The majority's consigning Lyle Roetcisoender to a life in prison for the crimes of assault and kidnapping committed while a child, when an adult who commits the same crimes would probably receive a sentence around twenty years, commands a detailed and thorough dissent.

------------

Petitioner Lyle Roetcisoender is mentally challenged. He was placed in special education beginning in the first grade. Br. of Pet'r, App., Ex. 3, A7. (Psychiatric Evaluation by Andrew Haffey). At age sixteen, Roetcisoender possessed a fifth grader's knowledge. Br. of Pet'r, App., Ex. 3, A7. (Psychiatric Evaluation by Andrew Haffey). Classmates belittled Roetcisoender at school. Br. of Pet'r, App., Ex. 2, A4. (Psychiatric Evaluation by Verne Cressey). Before July 30, 1987, Lyle Roetcisoender either had no criminal history or at least no felony record.

I agree with the State that Lyle Roetcisoender committed a heinous crime against a helpless two-year-old girl, T.J., on July 30, 1987. In an understatement, the details of the crime leave one horrified. T.J. was brain dead for ninety minutes. She miraculously revived. Her breath returned. Her heart beat again. Even more miraculously, T.J. suffered no brain damage. Roetcisoender was sixteen years of age on July 30, 1987.

Lyle Roetcisoender testified that, after kidnapping and assaulting T.J., he immediately regretted his actions and attempted to give cardiopulmonary resuscitation, or CPR, to the victim before fleeing. *State v. Roetcisoender*, No. 9260-7-III, at 2 (Wash. Ct. App. June 22, 1989) (unpublished). During interrogation by police, Lyle Roetcisoender

5

"became extremely emotional" and "weeped [sic] openly" when asked about the condition of T.J. Brief of Petitioner in Support of Personal Restraint (Br. of Pet'r), App., Ex. 9, at A48. (Supplementary Report by Sgt. John Harris). Law enforcement opined that an argument Roetcisoender had with his mother earlier in the day "might have contributed to his mood at the time of the kidnap [sic]." Br. of Pet'r, App., Ex. 9, at A48. (Supplementary Report by Sgt. John Harris)

According to an evaluation performed at Eastern State Hospital in August of 1987, Lyle Roetcisoender encountered difficulty reading simple sentences and performing rudimentary arithmetic. Br. of Pet'r, App., Ex. 2, A4. (Psychiatric Evaluation by Verne Cressey). Psychiatrist Verne Cressey assessed Roetcisoender's I.Q. as 65 and reported that "[h]e is obviously retarded." Br. of Pet'r, App., Ex. 2, at A4. (Psychiatric Evaluation by Verne Cressey). Roetcisoender underwent other evaluations in 1987. Psychiatrists Andrew Haffey and Richard Dennie diagnosed Roetcisoender as possessing limited cognitive intellectual abilities, impulsivity, and probable hyperactivity. Br. of Pet'r, App., Ex.3, A7. (Psychiatric Evaluation by Andrew Haffey). The two wrote in a September 1, 1987 report:

> Not surprisingly then, his capacity for impulse control appears quite inadequate. This is evident not only from the reports of aggressive and out of control behavior from school, but also in the test data where it appeared unable to think through a response, answering as quickly as he possibly could. When the examiner requested that he re-do a performance (for example, a simple drawing) with an emphasis on careful response, he would again perform quickly, impulsively, and without a great deal of quality. Although he exercised his right not to discuss the incident which

> brought him to the hospital, he denied any premeditation on his part, stating "it just happened."

Br. of Pet'r, App., Ex.3, at A7. (Psychiatric Evaluation by Andrew Haffey).

The State of Washington charged Lyle Roetcisoender with first degree kidnapping and attempted murder. On February 9, 1988, a jury convicted Roetcisoender of kidnapping in the first degree. The jury acquitted Roetcisoender of attempted murder, but found him guilty of the lesser offense of assault in the second degree.

The superior court conducted a sentencing hearing on March 18, 1988. During the hearing, Lyle Roetcisoender's counsel never asked the sentencing court to consider Roetcisoender's youth or diminished capacity.

Based on Lyle Roetcisoender's offender score of two, the standard range, in 1988, for kidnapping in the first degree was 62 to 82 months. Br. of Pet'r, App., Ex.5, A26 (Judgment and Sentence). The maximum sentence was life. Br. of Pet'r, App., Ex.5, A26. (Judgment and Sentence). The standard range for assault in the fourth degree was 12 to 14 months. Br. of Pet'r, App., Ex.5, A26 (Judgment and Sentence).

The Kittitas County Superior Court, rather than the jury as now required by United States Supreme Court precedent and Washington statute, found the aggravating circumstances of deliberate cruelty to the victim, a vulnerable victim, and a presumptive sentence clearly too lenient that would not promote respect for the law. With the finding of aggravating circumstances, the superior court imposed an upward exceptional sentence

7

and sentenced Lyle Roetcisoender to life imprisonment for kidnapping and fourteen

months for fourth degree assault.

The Kittitas County Superior Court entered findings of fact and conclusions of law to support the exceptional sentence. The findings and conclusions announced in part:Findings of fact:
. . . .
1.3 Psychological examinations done by Eastern State Hospital and by Dr. Montgomery of Yakima, Washington and introduced as evidence during the course of these proceedings reveal that the defendant, though not criminally insane, has a preoccupation with retribution, violence and homicide; that he has been and will be for the foreseeable future disposed to resolving conflicts by violence and homicide; that he has been and will be for the foreseeable future sexually attracted to children like [T.J.] because they are vulnerable. Because of this he is predatory and will remain so in the foreseeable future.
1.4 Mental health experts who introduced evidence during the course of these proceedings indicated that the chances of rehabilitation for the defendant are slim and that to the extent rehabilitation is possible, it can only be accomplished and the community can only be protected through a long period of incarceration and treatment. Information made available to the Court during the sentencing hearing shows that facilities are available in the Department of Corrections to sequester this defendant from the larger inmate population and to provide special sexual offender treatment for him at the Department of Corrections, Twin Rivers Institution.

Conclusions of law

2 .1 The Court hereby finds from the Findings of Fact that a sentence outside the standard range should be imposed under RCW 9.94A.390(2) because of the following aggravating factors:
(a) Defendant's conduct during the commission of the kidnaping and assault manifested a deliberate cruelty to the victim.
(b) The defendant knew that the victim was particularly vulnerable and incapable of resistance due to her age and body size.
(c) The operation of the multiple offense policy of RCW 9.94A.400 results in a presumptive sentence that is clearly too lenient in light of the following purposes of the Sentencing Reform Act:

(1) It would fail to insure the punishment for the offense as proportionate to the seriousness of the offense in this case. RCW 9.94A.010(1)

(2) It would fail to promote respect for the law by failing to provide punishment which is just. RCW 9.94A.010(2)

(3) It would fail to protect the public. RCW 9.94A.010(4)

(4) It would fail to offer the offender an opportunity to improve himself through rehabilitation. RCW 9.94A.010(5).

Br. of Pet'r, App., Ex. 6, at A31. (Findings of Fact and Conclusions of Law)

Neither the findings nor the conclusions mention Roetcisoender's age or intellectual disability at the time of his offense.

The transcript of the hearing demonstrates that the sentencing court was particularly motivated by retribution and did not consider Lyle Roetcisoender's youth. Br. of Pet'r., App., Ex. 6, A31. (Findings of Fact and Conclusions of Law). The sentencing judge mentioned that Roetcisoender cannot relate to reality. The court worried about Roetcisoender being responsive to treatment and his release endangering the community. Finally, the sentencing court commented:

There are no mitigating factors that I can think of to mitigate the seriousness of Lyle's conduct.

Respondent's Brief (Br. of Resp't), Ex. F, at 19.

The court did not explicitly set a minimum term of confinement. The judgment and sentence, dated March 18, 1998 reads:

IT IS ORDERED that defendant serve the determinate sentence and abide by the conditions set forth below.

. . . .

2.2 CRIMINAL HISTORY: The Defendant has no prior convictions constituting criminal history for purposes of calculating the offender score.

9

2.3 SENTENCING DATA:

|  | Offender Score | Seriousness Level | Range | Maximum Term |
|---|---|---|---|---|
| Count One | 2 | X | 62-82 months | Life |
| Count Two | 2 | IV | 12-14 months | 10 years |

2.4 EXCEPTIONAL SENTENCE: Substantial and compelling reasons exist which justify a sentence above the standard range for Count One and Count Two. Findings of Fact and Conclusions of Law are attached in Appendix B.

. . . .

4.2 CONFINEMENT OVER ONE YEAR: Defendant is sentenced to a term of total confinement in the custody of the Department of· Corrections as follows, commencing March 18, 1988;

Life imprisonment on Count No. One

14 months on Count No. Two

The terms in Counts No. One and Two are concurrent.

Credit is given for 234 days served.

4.3 The Court further orders:

The defendant shall be educated to the fullest extent of the State of Washington while incarcerated. He shall receive such psycho-therapeutic treatment as is available and appropriate in the Department of Corrections to rehabilitate him during his incarceration. When there is convincing evidence of the defendant's rehabilitation, the subject of his release may be addressed as provided by *the law related to commutations and pardons, by the Clemency and Pardons Board*, provided the defendant has served a minimum term of 108 months, including credit for time served of 234 days.

Br. of Pet'r, App., Ex. 5 at A26. (Judgment and Sentence) (emphasis added). I highlight that the sentence provides for release only with a commutation or pardon. The sentence does not mention the possibility of parole.

Lyle Roetcisoender has now lived 449 months or thirty-seven years and five months in prison. During these years in DOC custody, psychologists have diagnosed Roetcisoender with mental illnesses and intellectual disabilities. Roetcisoender has spent

nearly the entirety of his incarceration in mental health units. He continues to encounter difficulty in reading and writing. He struggles with self-harming behaviors, such as picking at his skin until the skin bleeds and inserting objects into his anus to the point of injury. Br. of Pet'r, App., Ex. 7, A35. (Mental Health Update). According to Roetcisoender, incarceration has exacerbated his serious mental conditions.

In June 2022, thirty-four years after his conviction, Lyle Roetcisoender's incarceration and possible release came before the Indeterminate Sentence Review Board (ISRB) under RCW 9.94A.730. The statute, which I will review later, allows offenders, who committed their crimes while under the age of 18 and who were sentenced as adults, to petition the ISRB for early release after serving no less than twenty years of total confinement. The record does not indicate why the scheduling of an ISRB review took decades. We surmise that the ISRB failed to schedule a hearing because the DOC database falsely equated Roetcisoender's term as life without parole. Under such a sentence, the database lists the sentence as 999 years, a sentence even beyond the lifespan of Methuselah.

In 2022, the ISRB file on Lyle Roetcisoender included a DOC report from August 2, 2020:

> DOC Mental Health Update on August 2, 2020
> Per chart review, Mr. Roetcisoender has had a history of sexually acting out with fascination on his feces and penis while at Maple Lane Juvenile Detention, and in prison had a habit of inserting objects into his anus to the point of injury, possibly indicating polyembolokoilamania. Mr. Roetcisoender has ceased this behavior due to pharmacological intervention.

11

On April 13, 2017 Madeline Wielgus, M.S., tested Mr. Roetcisoender utilizing the Wechsler Adult Intelligence Scale 4th Addition (WAIS-IV) with a result that his full scale *I.Q. was 53*. Per chart review, he also has a history of special education for learning disabilities.

Since January 27, 2020, Mr. Roetcisoender has been infraction free, but did have one negative B.O.E. [Behavior Observation Entries] in February 2020 for passing coffee to another inmate. As of March 2017, he has 41 BOE's with 37 being negative and one listed as a positive for cleaning his cell. Most relate to his hygiene, or rather the lack of it, and his cell's cleanliness. . . .

**Current psychotropic medications:**
OLANZAPINE l0MG lx at night
FLUVOXAMINE l00MG ltab 2x daily
PRAZOSIN lMG lx noc Med line
DIPHENHYDRAMINE 25MG lx at night
DIVALPROEX DRUD 500MG lx at night
LISINOPRIL lMG lx daytime

**Response to psychotropic medications since last appraisal or update:** Mr. Roeticisoender seems to be benefitting positively to current psychotropic regimen as supported by remaining infraction free, less negative BOEs, one positive BOE, and no signs of antagonistic and sexually inappropriate conduct. Per chart review, Mr. Roeticisoender is compliant with all of his medications be it psychotropic, or somatic.

**Summary of and response to other forms of treatment since last appraisal or update.** Mr. Roeticisoender . . . enjoys attending groups and rarely, if ever misses one. He currently enjoys DBT Overview & Art Group, and regularly attends two groups per quarter and meets with his therapist bi-weekly without missing a session. Mr. Roeticisoender continues to be exhibiting picking behaviors, but is willing to discuss this issue and work on measurable alternatives to this behavior. . . . He also serves E-Unit as a group room porter and regularly cleans.

Comments on Observations *I* Mental Status:

Mr. Roetcisoender is cooperative, engaged, alert and oriented times four, does not appear to be responding to internal stimuli, regularly denies suicidal, or homicidal ideation, and usually exhibits some visible signs of picking, either on the forehead, or on the arms, in various states of healing. He also displays a latency in response to questions at times, but also speaks within normal limits at other times. .

. . . .

  **Harm to Self / Other:** . . . Mr. Roetcisoender . . . did report having some suicidal ideation subsequent to his grandfather's death. He reported he poked himself in his arm with a comb to the point it drew blood.

  . . . .

  **Formulation and Diagnostic Rationale: Excoriation Disorder:** Mr. Roetcisoender is frequently seen with excoriation on his forehead, arms, and neck, and may purposely wear long sleeve shirts to cover up his arms. Mr. Roetcisoender frequently denies that he is engaging in this behavior, until asked directly and even when there are smears of blood on his clothing, due to him wiping off the blood from his fingers onto his shirts and pants after he has been picking the scab until it bleeds, and then he admits he has been picking. . . . This behavior has caused him many issues others as it keeps him isolated.

  . . . .

  **Antisocial Personality Disorder:** Mr. Roetcisoender appears to meet DSM-V criteria for Antisocial Personality Disorder as evidenced by, and per chart review, Criteria A; being diagnosed with a conduct disorder prior to age fifteen, was cruel to animals, impulsive, failed to conform to social norms, failed to plan ahead, reckless disregard to the suffering of others, and was convicted of kidnapping and assaulting a two-year old when sixteen and *sentenced to life without parole* as a result due to the heinous nature of the offense, and these behaviors do not appear to be better explained by another mental disorder, Criteria B: Is eighteen years of age, Criteria C: evidence of a conduct disorder before age fifteen, and Criteria D: the occurrence of antisocial behavior is not exclusively during the course of schizophrenic, or bipolar.

  **DSM-5 Diagnoses**
  Name of diagnosis
  L98.1 Excoriation Disorder;
  F70 Intellectual Disability, Mild;
  F60.2 Antisocial Personality Disorder
  IZI 40-31 Reality testing impaired/communication/several areas - Needs residential treatment. Symptoms likely to prevent programming other than highly structured MH programming. Behavioral problems related to symptoms regularly observed. ADLs [activities of daily life] generally intact but may need support.

  IZI Residential Treatment (describe needs) Needs residential treatment in the form of groups, individual therapy, and pharmacological interventions. Symptoms likely to prevent programming other than highly structured MH programming where staff are able to engage him in

treatment, groups, and incentive programs.  Behavioral problems related to symptoms regularly observed.

Br. of Pet'r, App., Ex. 7, at A35.  (Mental Health Update) (emphasis added).

I underscore that the DOC 2020 report identified Lyle Roetcisoender's sentence as life without parole.  His intelligence quotient by 2020 had fallen from 65 in 1987 to 53.

The DOC psychologist listed, in the 2020 DOC update, a possible diagnosis of polyembolokoilamania.  Polyembolokoilamania is the act of inserting foreign bodies into orifices such as the rectum, urethra, or vagina.  This mania is often exhibited by patients with Smith–Magenis syndrome.  In turn, Smith–Magenis syndrome is a genetic disorder caused by an abnormality in the short arm of chromosome 17.  Those with the syndrome suffer from intellectual disability, facial abnormalities, difficulty sleeping, and numerous behavioral problems such as self-harm.

The ISRB conducted a hearing on June 22, 2022.  Lyle Roetcisoender attended the hearing by videoconference.  Counsel represented him.  The Board issued a decision on July 11, 2022 that denied release.  The decision proclaimed:

> Based on the burden of proof set out in RCW 9.94A.730 and the totality of evidence and information provided to the Board, the Board does find by a preponderance of the evidence that Mr. Roetcisoender is more likely than not to commit any new criminal law violations if released on conditions.  Consequently, the Board finds Mr. Roetcisoender not releasable.  Mr. Roetcisoender can re-submit a petition for review in 48 months.
> **REASONS FOR DECISION:** This was a deferred decision following a full Board discussion using a structured decision-making framework that takes into consideration: the statistical estimate of risk, criminal history, parole/release history, ability to control behavior, responsivity to programming, demonstrated offender change, release

14

planning, discordant information, and other case specific factors. Based on the requirements of RCW 9.94A.730 the Board finds Mr. Roetcisoender is more likely than not to commit a new crime if released with conditions that are designed to help better prepare him for a successful re-entry into society.

Mr. Roetcisoender is determined to be not releasable based on the following: Though not convicted of a sexual offense, there were sexual elements to the offense and Mr. Roetcisoender has not yet participated in the Sex Offender Treatment and Assessment Program (SOTAP) to address his risks. He indicates a willingness to do so.

Has significant mental health problems that appear to be related to his crime of conviction and potential risk of re-offense. He is classified as an S3. He has resided in mental health units throughout most of his prison stay.

He experiences a great deal of anxiety regarding any possible move to a more open living unit. He will need a step-down process of sorts to assist him in making any changes to more independent living prior to release consideration.

Demonstrates no insight into offending behavior.

It is unlikely that conditions of release would sufficiently reduce the risk of re-offense if released at this time.

RECOMMENDATIONS: Mr. Roetcisoender should be referred to the SOTAP [sexual offender treatment] as soon as possible. He should remain serious infraction free and make every effort to tolerate more interaction with staff and inmates. He should engage more fully in mental health treatment by discussing his struggles with staff on working on interventions.

**OFFENSE DESCRIPTION:** According to file material, Mr. Roetcisoender, at his age of 16, abducted a 2 ½ year old unknown female from her front yard by picking her up and carrying her away. The victim's 5-year-old brother ran in the house to report what happened. A search ensued and the victim was found naked, unconscious, and face-down in a nearby creek. When apprehended for the crime Mr. Roetcisoender admitted to taking the victim, beating her into unconsciousness and digitally penetrating her vagina.

Br. of Pet'r, App., Ex. 8, at A41. (ISRB Decision and Reasons). Contrary to the ISRB

ruling, court records do not show that Lyle Roetcisoender admitted to digitally

penetrating T.J.'s vagina. Also, the State did not convict Roetcisoender of a sex offense.

----------

In his personal restraint petition, Lyle Roetcisoender raises three nuanced arguments. First, his 1988 judgment and sentence is invalid on its face because it contravened the Sentencing Reform Act of 1981 (SRA) by imposing an indeterminate sentence. Second, his 1988 judgment and sentence violates the United States Constitution and the Washington State Constitution by imposing on him a life without parole sentence despite being sixteen years of age at the time of his crimes. Third and related to the first argument, his judgment and sentence breaches the United States Constitution and the Washington State Constitution because the sentencing court failed to meaningfully consider his age before imposing a life sentence.

The State answers the personal restraint petition by arguing RCW 10.73.090 bars the petition because Lyle Roetcisoender did not file the petition within one year. The State further contends the petition fails because Roetcisoender enjoys an adequate alternative remedy found in RCW 9.94A.730.

Lyle Roetcisoender replies that the one-year time bar does not apply because his judgment and sentence is invalid on its face and because he relies on a constitutional ruling applied retroactively. He further contends that that an ISRB petition no longer constitutes an alternative remedy because he may not file another petition until 2026. Finally, he argues that an ISRB review hearing is not an adequate remedy for claims based on *Houston-Sconiers* because the Board does not address the *Miller* factors.

----------

16

Since we do not address a constitutional question if we can resolve the appeal on statutory grounds, I address Lyle Roetcisoender's statutory argument first. *Tunstall v. Bergeson*, 141 Wn.2d 201, 210, 5 P.3d 691 (2000). The superior court sentenced Roetcisoender in 1988 for a crime committed in 1987, after adoption of the SRA. In general, the act established a determinate sentencing regime. Thus, according to Roetcisoender, the court should have issued a determinate sentence. Going further, Roetcisoender insists his sentence of life imprisonment does not fit within the definition of a determinate sentence. Finally, according to Roetcisoender, because the court did not impose a determinate sentence, the sentence is invalid on its face.

According to Lyle Roetcisoender, DOC takes actions based on the length of a sentence. Those actions include calculating earned release. When the offender receives a sentence for life, DOC either has difficulty or may not even calculate earned good time credits because DOC cannot predict the offender's date of death. For this reason, among others, a life sentence cannot be classified as a determinate sentence.

In opposition, the State insists Lyle Roetcisoender's 1988 sentence constituted a determinate sentence. According to the State, even if the sentencing court did not know the number of years Roetcisoender might serve, the term was definite because the only length the sentence could last was Roetcisoender's lifetime.

In 1987, the kidnapping crime read similar to the statute today:

> KIDNAPING IN THE FIRST DEGREE.
> (1) A person is guilty of kidnaping in the first degree if he intentionally abducts another person with intent:

(a) To hold him for ransom or reward, or as a shield or hostage; or
(b) To facilitate commission of any felony or flight thereafter; or
(c) To inflict bodily injury on him; or
(d) To inflict extreme mental distress on him or a third person; or
(e) To interfere with the performance of any governmental function.
(2) Kidnaping in the first degree is a Class A felony.

Former RCW 9A.40.020. Kidnapping was and remains today a Class A felony.

In 1988, as today, the maximum sentence for a Class A felony was life in prison.

The sentencing statute in 1988 declared:

AUTHORIZED SENTENCES OF OFFENDERS.

(1) Felony.
Every person convicted of a classified felony shall be punished as follows:
(a) For a Class A felony, by imprisonment in a state correctional institution for a maximum term fixed by the court of not less than twenty years or by a fine of not more than ten thousand dollars or by both such imprisonment and fine;

RCW 9.20.021.

In 1988, the former RCW 9.94A.120 read that "a sentence outside the standard range shall be a determinate sentence." (Recodified as RCW 9.94A.505.) The Kittitas County Superior Court imposed a sentence outside the standard range. Another statute, RCW 9.94A.030, defined a "determinate sentence" in 1988:

(18) "Determinate sentence" means a sentence that states with exactitude the number of actual years, months, or days of total confinement.

I surprisingly find no case law that definitively declares whether a life sentence constitutes an indeterminate sentence or a determinate sentence. I find, however, a trickle of Washington and foreign cases that distinguish between "an indeterminate life

18

sentence" and a "determinate sentence," suggesting that a life sentence is indeterminate. *State v. Beals*, 100 Wn. App. 189, 997 P.2d 941, 947 (2000); *State v. Ross*, 71 Wn. App. 556, 861 P.2d 473 (1993), *amended*, 71 Wn. App. 556, 883 P.2d 329 (1994); *Hollis v. State*, 173 Idaho 1021, 551 P.3d 1262 (2024); *State v. Campbell*, 170 Idaho 232, 250, 509 P.3d 1161 (2022); *People v. McDowell*, 99 Cal. App. 5th 1147, 1155–56, 318 Cal. Rptr. 3d 453 (2024), *review denied* (May 1, 2024).

I need not resolve whether a life sentence qualifies as a determinate sentence because that issue lacks importance. The focal question is whether the life sentence violated the SRA, not whether a life sentence is an indeterminate sentence. Conceivably, although the SRA favors a determinative sentence and a life sentence constitutes an indeterminate sentence, some statute might override the requirement of imposing a determinate sentence as in the case of the State's Persistent Offender Accountability Act (POAA).

In *State v. Beals*, 100 Wn. App. 189 (2000), the offender argued that his life sentence imposed as a result of his being a persistent offender violated the SRA requirement that a determinate sentence be imposed "with exactitude." This court rejected the argument because the POAA, as part of the SRA, expressly stated that persistent offenders would be sentenced to life. Thus, the POAA life sentence functioned as an exception to the requirement of a determinate sentence.

To repeat, in 1988, pursuant to RCW 9A.20.021 and 9A.40.020, the statutory maximum for kidnapping in the first degree was life in prison. Although the two statutes

19

are not part of the SRA, they evidence a desire on the part of the legislature to allow a life sentence for the serious crime of kidnapping despite a general rule promoting determinate sentences. RCW 9A.20.021 was reenacted last in 2015, decades after the sentencing reform act of 1981. Chapter 265 §16, LAWS OF 2015.

As circumscribing its coverage to Class A felonies, RCW 9A.20.021 reads more narrowly than the broad language of RCW 9.94A.505. A general statutory provision must yield to a more specific statutory provision. *Washington State Association of Counties v. State*, 199 Wn.2d 1, 13, 502 P.3d 825 (2022). This principle does not result in the more specific statute invalidating the general statute. *Washington State Association of Counties v. State*, 199 Wn.2d 1, 13 (2022). Instead, the law considers the specific statute as an exception to, or qualification of, the general statute, whether it was passed before or after such general enactment. *Wark v. Washington National Guard*, 87 Wn.2d 864, 867, 557 P.2d 844 (1976).

I conclude that, regardless of whether a life sentence for first degree kidnapping qualifies as an indeterminate sentence, the sentencing court had authority, under the SRA, to issue the life sentence. To employ two negatives, unless another reason exists, outside the SRA, to invalidate the sentence, Lyle Roetcisoender's 1988 life sentence was not invalid on its face. A judgment is invalid on its face only if the court has exceeded its authority in entering the judgment and sentence. *In re Personal Restraint of Coats*, 173 Wn.2d 123, 135-36, 267 P.3d 324 (2011).

20

Lyle Roetcisoender contends no statute authorizes an indeterminate life sentence for kidnapping in the first degree without any prior convictions or a finding of sexual motivation. He does not cite any statute that precludes such a sentence if the offender lacks earlier convictions or the absence of a sexual motivation finding.

Lyle Roetcisoender may advocate for the invalidity on its face of the 1988 judgment and sentence in order to avoid the RCW 10.73.100 one-year time bar for a personal restraint petition. But, I conclude that Roetcisoender need not win this point for the granting of his petition.

----------

The parties quarrel over whether the 1988 sentence constitutes a life sentence with the possibility of parole or a life sentence without the possibility of parole. The State, contrary to Lyle Roetcisoender, posits that the Kittitas County Superior Court sentenced Roetcisoender to life with parole. The resolution of this disagreement between the parties does not control the question of whether the superior court imposed an unconstitutional sentence. But the solution to the dispute influences the answer to this personal restraint petition's principal issue.

The State writes that the 1998 judgment and sentence expressly states that the life sentence recognizes the possibility of parole. It does not. The sentence only references a pardon or commutation. To repeat, the 1988 judgment and sentence declared:

> When there is convincing evidence of the defendant's rehabilitation, the subject of his release may be addressed as provided by the law related

21

> to commutations and pardons, by the Clemency and Pardons Board,
> provided the defendant has served a minimum term of 108 months.

Br. of Petr'r, App., Ex. 5, A26. (Judgment and Sentence).

The sentence did not expressly employ the phrase "life without the possibility of parole." Nevertheless, the judgment and sentence makes no reference to parole. Because Lyle Roetcisoender committed his offense after the effective date of the SRA, he, in 1988, did not fall under the jurisdiction of the ISRB until twenty-five years later. Therefore, a literal reading of the sentence results in Roetcisoender lacking any meaningful possibility of parole by the sentencing court even after he had served 108 months.

I have never read a criminal judgment and sentence that references the possibility of release through a pardon or clemency, but not parole. Neither party has suggested that other such sentences exist. After reflection, the sentence makes no sense.

The 1988 sentence's language only affords release before death through a pardon or commutation. These two actions do not equate or function equivalently to parole because any person convicted of any crime may seek clemency or pardon regardless of one's sentence. The governor may grant a pardon or clemency before the running of any minimum term set by the courts. In addition, the governor enjoys unbridled discretion when determining whether to grant or deny one of the two offerings. The governor need not issue a reasoned decision, and the courts cannot review the pardon or clemency. *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 464-65, 101 S. Ct. 2460, 69 L.

Ed. 2d 158 (1981). Thus, an offender lacks any cognizable liberty interest in the receipt of clemency or pardon, and the clemency process is not generally subject to judicial review. *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 464-65 (1981). Thus, the 1998 judgment presented Roetcisoender no meaningful opportunity for release.

Lyle Roetcisoender's supposed minimum term of 108 months passed in August 1996 without any recognition from DOC, the ISRB, or the court. This passage of time without any action confirms that Roetcisoender lacked and continues to lack any right to parole. The ISRB did not review Roetcisoender's incarceration until 2022 and then only did so as a Juvenile Board case under RCW 9.94A.730. The Washington State Legislature did not enact RCW 9.94A.730 until 2014.

This analysis intimates that the 1988 sentencing court imposed a sentence of life without possibility of parole. Because Lyle Roetcisoender received this sentence when he was sixteen years old, the sentence inflicts cruel punishment and violates the Eighth Amendment of the United States Constitution and article I section 14 of the Washington State Constitution as shown below.

The State argues that Lyle Roetcisoender does not suffer a de facto life sentence because he has the opportunity for parole through the ISRB. Of course, although the ISRB has assumed jurisdiction, the sentence does not read that way. In fact, Washington's system of parole effectively ended on July 1, 1984. *State v. Carter*, 3 Wn.3d 198, 214, 458 P.3d 935 (2024). Unlike juveniles sentenced to life without parole for aggravated first degree murder under RCW 10.95.030, Roetcisoender does not have a

right for his sentence to be reviewed by the ISRB but instead a right to petition for release if he meets certain preconditions, such as having no serious misconduct or felony conviction while imprisoned. Regardless, the judgment and sentence imposed a life sentence. Roetcisoender has served thirty-seven years with no probability of ever being released. The State cites no law that indicates the possibility of parole or release by definition precludes a sentence from being a de facto life sentence particularly when the judgment and sentence imposed a life sentence.

---------

I move to the crux of the personal restraint petition, the unconstitutionality of a life sentence for a youthful offender. The United States Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460 (2012) and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), and the Washington Supreme Court's decision in *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), brought promise for juvenile offenders. The decisions recognized the foolhardiness of sentencing juveniles as adults, and the rulings directed that youth already sentenced to long terms should have those sentences reviewed and reduced based on factors now known as *Miller* factors. The decisions brought hope to juvenile offenders for a mature life without constant caging.

In the previous century, American jurisprudence treated teenage murderers the same as adult murderers. Juvenile courts rotely declined jurisdiction over a teenager accused of murder, and the adult courts prosecuted and sentenced teenagers as if adults. A sixteen-year-old, who committed a crime, was deemed as blameworthy as a fifty-year-

24

old, who committed the same crime. *In re Boot*, 130 Wn.2d 553, 569-70, 925 P.2d 964 (1996).

In the 1980s and early 1990s, rising crime rates piloted academics and the media to create the phantom juvenile super-predator to justify harsher punishment and prosecuting youth in adult court for violent crimes. JEFFREY BUTTS & JEREMY TRAVIS, URBAN INSTITUTE, THE RISE AND FALL OF AMERICAN YOUTH VIOLENCE: 1980 TO 2000 (2002), https://www.urban.org/sites/default/files/publication/60381/410437-The-Rise-and-Fall-of-American-Youth-Violence.PDF. In 2001, the United States Office of the Surgeon General labeled the super-predator theory a myth. UNITED STATES OFFICE OF THE SURGEON GENERAL, YOUTH VIOLENCE: A REPORT OF THE SURGEON GENERAL ch. 1, at 5 (2001), https://www.ncbi.nlm.nih.gov/books/NBK44297/?report=reader.

Beginning in 2005, the United States Supreme Court acknowledged advances in neurological science. The federal Supreme Court thereafter issued landmark decisions, under the Eighth Amendment's cruel and unusual punishment clause, concerning juvenile offender sentencing. *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); and *Montgomery v. Louisiana*, 577 U.S. 190 (2016).

The prefrontal cortex, an important part of one's brain, sits at the front of the frontal lobe, which lies immediately behind the forehead. The cortex is connected to many other parts of the brain and sends and receives information. Mariam Arain et al.,

*Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013). The prefrontal cortex assists in many brain functions, one of which is executive function or the ability to self-regulate and plan ahead. Examples of executive function include: controlling your behavior and impulses, delaying instant gratification, making decisions, solving problems, planning long term goals, balancing short-term rewards with future goals, adapting one's behavior as situations change, understanding and predicting one's behavior, synthesizing many streams of information, and focusing one's attention. Mariam Arain et al., *supra*. A growing body of longitudinal neuroimaging research has demonstrated that the brain continues to grow and change during adolescence, thereby modernizing longstanding assumptions that the brain ceased maturing by puberty. J.N. Giedd et al., *Brain Development during Childhood and Adolescence: A Longitudinal MRI Study*, 2 NATURE NEUROSCIENCE 861 (1999).

The prefrontal cortex of the brain grows as a person matures from childhood to early adulthood. The cortex is one of the last parts of the brain to develop completely. In general, the prefrontal cortex does not fully mature until age 25, which prompts car insurance companies to charge higher rates until a person turns 25 because those younger are high-risk drivers. The prefrontal cortex assesses risk-taking and decision-making, both important for driving. Tobias Grossmann, *The Role of Medial Prefrontal Cortex in Early Social Cognition*, 7 FRONTIERS IN HUMAN NEUROSCIENCE 340 (2013), https://doi:10.3389/fnhum.2013.00340.

According to the United States Supreme Court, the cruel and unusual punishment clause demands that the penal system treat offenders under the age of eighteen differently. Children's lack of maturity and underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless risk taking. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Children are more vulnerable to negative influence and outside pressure from family and peers, have limited control over their environments, and lack the ability to extricate themselves from horrific, crime-producing settings. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Adolescent brains are not yet fully mature in regions and systems related to higher order executive functions such as impulse control, planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. 460, 475 n.5 (2012). All of these features impact a tendency to commit a crime. *Miller v. Alabama*, 567 U.S. 460, 473 (2012). Commonsense, parental knowledge, physical science, and social science confirm these observations. *Miller v. Alabama*, 567 U.S. 460, 472 n.5 (2012). Because a child's character is not as well-formed as an adult's, the child's traits are less fixed, and his actions are less likely to be evidence of depravity. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

According to the United States Supreme Court, the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. *Miller v. Alabama*, 567 U.S. 460, 472

(2012). Deterrence supplies a flawed rationale for punishment because of juveniles' impulsivity and inability to consider the consequences of their actions. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Retribution's focus on blameworthiness also does not justify a lengthy sentence because juveniles have severely diminished moral culpability. *Miller v. Alabama*, 567 U.S. 460, 472 (2012). Incapacitation fails to justify a long sentence because adolescent development diminishes the likelihood that an offender forever will be a danger to society. *Miller v. Alabama*, 567 U.S. 460, 472-73 (2012). With a new understanding of juvenile brain development, the United States Supreme Court established strictures on harsh and long sentences for teenagers, even youth committing murder. The Eighth Amendment's cruel and unusual punishment clause compelled these sentencing restrictions. Because of the constitutional nature of children, including teenagers, the United States Supreme Court, in *Miller v. Alabama*, 567 U.S. 460 (2012), mandated that a sentencer follow a process that incorporates consideration of the offender's chronological age and its hallmark features and other mitigating features before imposing life without parole. The attended characteristics include: (1) chronological age, (2) immaturity, impetuosity, failure to appreciate risks and consequences, (3) the surrounding family and home environment, (4) the circumstances of the offense, (5) the extent of the offender's participation in the offense, (6) any pressures from friends or family affecting him, (7) the inability to deal with police officers and prosecutors, (8) incapacity to assist an attorney in his or her defense, and (9) the possibility of rehabilitation. *Miller v. Alabama*, 567 U.S. 460, 477-78 (2012). Courts

28

now call these characteristics "the *Miller* factors." Under the cruel and unusual punishment clause, sentencing courts must exercise their discretion at the time of sentencing itself with regard to the youth of the offender, regardless of what opportunities for discretionary release may occur in the future. *Miller v. Alabama*, 567 U.S. 460, 477-83 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 20 (2017).

In *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the high Court readdressed the subject of life without parole sentences for juvenile homicide offenders. *Montgomery* held that *Miller* applied retroactively to offenders who were juveniles when they committed their crimes. Against contentions that the *Miller* ruling only imposed a procedure for resentencing, the Court announced that *Miller* established a substantive rule that juveniles, whose crimes reflect "only transient immaturity" and who have since matured, will not be forced to serve a life without parole sentence. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). Under the cruel and unusual punishment clause, sentencing courts must exercise their discretion at the time of sentencing itself with regard to the youth of the offender, regardless of what opportunities for discretionary release may occur in the future. *Miller v. Alabama*, 567 U.S. 460, 477-83 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 20 (2017).

The Washington Supreme Court has ruled that Washington Constitution's article I, section 14, which prohibits cruel punishments, extends greater protections to offenders, including juvenile offenders. *State v. Bassett*, 192 Wn.2d 67, 79-80 (2018). Going further, in *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), the Washington Supreme

Court addressed *Miller v. Alabama*'s applicability to juvenile defendants who receive lengthy sentences for crimes other than homicide. The Evergreen high court held that sentencing courts possess absolute discretion under the SRA to depart as far as desired below the otherwise applicable sentencing ranges when sentencing juveniles in adult court. Sentencing courts also may exercise the prerogative to reduce or ignore sentencing enhancements. To the extent Washington sentencing statutes had been interpreted to bar such discretion with regard to juveniles, the high court deemed the statutes unconstitutional. Rendering sentences routinely imposed on adults will often be too harsh when applied to youth. *State v. Houston-Sconiers*, 188 Wn.2d 1, 19 (2017). *Houston-Sconiers* extended protections against disproportionate punishment to all juveniles subject to the adult sentencing reform act of 1981 sentences and enhancements. *State v. Harris*, 559 P.3d 499, 505 (November 27, 2024). The Washington Supreme Court further extended the dictates of the *Miller* factors to young adults who were nineteen and twenty years old at the time of their offenses because of the lack of full brain development until age 25. *In re Personal Restraint of v. Monschke*, 197 Wn.2d 305, 313, 482 P.3d 276 (2021).

When asserting the cruel punishment clause to attack a sentence, a defendant may bring a categorical challenge by arguing that an entire class of sentences is disproportionate based on the nature of the offense or the characteristics of a class of offenders. *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 2022 (2010); *State v. Bassett*, 192 Wn.2d 67, 83 (2018). Or the offender may raise an as-applied challenge by

asserting that the length of a sentence is grossly disproportionate given the offender's circumstances. *State v. Bassett*, 192 Wn.2d 67, 73 (2018); *State v. Moen*, 4 Wn. App. 2d 589, 598, 422 P.3d 930 (2018). Lyle Roetcisoender principally, but not exclusively, relies on a categorical bar of life sentences for youth offenders.

In response to the United States Supreme Court's decision in *Miller v. Alabama*, the Washington State Legislature passed S.B. 5064, colloquially known as the "*Miller* fix statute." LAWS OF 2014, ch. 130, § 9(3)(b); codified at RCW 9.94A.730 and RCW 10.95.030(3). One section of the statute, RCW 10.95.030(3), affords an opportunity for resentencing of offenders sentenced, for crimes committed before age eighteen, to life without possibility of parole under Washington's aggravated murder statute before they were 18 years old. This statute applies only to offenders convicted of aggravated first degree murder. Importantly, the statute entitles the offender to the same sentencing, before the superior court not a government board, that he should have received when convicted, including a sentencing that reviews the *Miller* factors. This opportunity for resentencing before the superior court under the *Miller* factors does not extend to those convicted of lesser crimes such as first degree kidnapping or even second degree murder. The final section of the *Miller*-fix statute, RCW 9.94A.730, includes a provision authorizing juvenile offenders imprisoned from crimes other than aggravated first degree murder to petition the ISRB for early release after serving at least twenty years of confinement. The statute reads in part:

(1) Notwithstanding any other provision of this chapter, any person convicted of one or more crimes committed prior to the person's 18th birthday may petition the indeterminate sentence review board for early release after serving no less than 20 years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's 18th birthday, the person has not committed a disqualifying serious infraction as defined by the department in the 12 months prior to filing the petition for early release, and the current sentence was not imposed under RCW 10.95.030 or 9.94A.507. . . .

. . . .

(6) An offender released by the board is subject to the supervision of the department for a period of time to be determined by the board, up to the length of the court-imposed term of incarceration.  The department shall monitor the offender's compliance with conditions of community custody imposed by the court or board and promptly report any violations to the board.  Any violation of conditions of community custody established or modified by the board are subject to the provisions of RCW 9.95.425 through 9.95.440.

(7) An offender whose petition for release is denied may file a new petition for release five years from the date of denial or at an earlier date as may be set by the board.  (8) An offender released under the provisions of this section may be returned to the institution at the discretion of the board if the offender is found to have violated a condition of community custody.  The offender is entitled to a hearing pursuant to RCW 9.95.435.  If the board finds that the offender has committed a new violation, the board may return the offender to the institution for up to the remainder of the court-imposed term of incarceration.  The offender may file a new petition for release five years from the date of return to the institution or at an earlier date as may be set by the board.

A hearing before the ISRB under RCW 9.94A.730 is not a resentencing.  *In re Personal Restraint of Brooks*, 197 Wn.2d 94, 102, 480 P.3d 399 (2021).  Instead, an early release hearing under the statute looks to the future and focuses on one's likelihood of reoffending.  *In re Personal Restraint of Brooks*, 197 Wn.2d 94, 102 (2021).  I will return to the nature of RCW 9.94A.730 and its differences from RCW 10.95.030 later when

discussing an adequate alternative remedy. For now, I turn to the Washington Supreme

Court decision controlling this petition: *State v. Bassett*, 192 Wn.2d 67 (2018).

*State v. Bassett*, 192 Wn.2d 67 (2018) suggests, if not demands, that, because of

the decades that Lyle Roetcisoender has spent in prison, he should be released now. In

*Bassett*, the Washington Supreme Court addressed the constitutionality of RCW

10.95.030, the aggravated first degree murder resentencing statute. The court held that

sentencing juvenile offenders to life without parole or early release, even if discretionary

rather than mandatory, constitutes cruel punishment and therefore is unconstitutional

under article I, section 14 of the Washington Constitution. In turn, the Washington

Supreme Court declared unconstitutional that portion of RCW 10.95.030 that permitted

the imposition of life imprisonment without parole.

In 1995, when Brian Basset was sixteen years old, he lived in a shack with a friend

after Bassett's parents expelled him from home. With assistance from his friend, Bassett

returned home, shot and killed his mother and father, and drowned his brother in a

bathtub. The superior court convicted Bassett of three counts of aggravated first degree

murder. The superior court deemed Bassett a walking advertisement for the death

penalty, but sentenced him to three consecutive terms of life in prison without parole.

In 2015, Brian Bassett returned to superior court for the resentencing, under

RCW 10.95.030 and .035, required for those convicted of aggravated first degree murder.

The superior court again sentenced him to three consecutive life without parole

sentences. The Court of Appeals adjudged the sentence in RCW 10.95.030 permitting a life sentence without parole unconstitutional. The Supreme Court accepted review.

On appeal, Brian Bassett argued that RCW 10.95.030(3) was unconstitutional under Washington's cruel punishment clause because it permitted life sentences for juveniles convicted of aggravated first degree murder. The Washington Supreme Court faced the initial question of whether to apply a grossly disproportionate sentence analysis or a categorical bar analysis. In the end it did not matter, since the court declared RCW 10.95.030(3) unconstitutional under either approach. Nevertheless, the court deemed the categorical bar analysis more suitable.

The Supreme Court, in *State v. Bassett*, observed that the *Fain* disproportionality framework focuses away from the characteristics of the offender class. *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980). The *Fain* test instead weighs the offense with the punishment. Thus, the *Fain* framework uncomfortably analyzes a claim of cruel punishment based on the offender's class of youth. The categorical bar analysis, on the other hand, directs a court to consider the nature of children. The categorical approach requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question and whether the sentence serves legitimate penological goals. Issues of culpability, the severity of the punishment, and whether penological goals are served all allow the court to include youth-specific reasoning into the analysis. When addressing punishment of children, the court generally does not focus on the severity of the crime.

The Washington Supreme Court, in *State v. Bassett*, applied the categorical bar analysis and found RCW 10.95.030 constitutionally wanting. The court agreed with Brian Bassett that the direction of change in the United States unmistakably and steadily moves toward abandoning the practice of putting child offenders in prison for their entire lives. This observation did not control but weighed in favor of finding that sentencing juvenile offenders to life without parole is cruel punishment under article I, section 14. RCW 10.95.030, a portion of the *Miller*-fix statute, allowed children to be sentenced to the extremely severe punishment of life without parole.

The Washington Supreme Court adopted the United States Supreme Court's characterization in *Graham v. Florida* of permitting a juvenile to die in prison as harsh. Life without parole alters the offender's life with an irrevocable forfeiture and deprives individuals of the most basic liberties without giving hope of restoration. The sentence is especially harsh for children, who will on average serve more years and a greater percentage of their lives in prison than an adult offender. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential.

The Washington Supreme Court, in *State v. Bassett*, reflected that a life sentence does not serve the penological goals of retribution, deterrence, incapacitation, or rehabilitation in the context of youth committing even heinous crimes. The distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders. The heart of retribution relates to an offender's

35

blameworthiness, and children have diminished culpability. Deterrence lacks effect in this context, because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—render them less likely to consider potential punishment. Rehabilitation is not supported by a juvenile life sentence because the sentence forswears altogether the rehabilitative ideal. Incapacitation is not well-served by sentencing juveniles to life without parole because deciding that a juvenile offender forever will be a danger to society would require a judgment that he is incorrigible, but incorrigibility is inconsistent with youth. The penological goal of incapacitation is especially concerning given the fact that the sentence makes an irrevocable judgment about that person at odds with what we know about children's capacity for change.

The Washington Supreme Court, in *State v. Bassett*, while recognizing that, under United States Supreme Court precedent, only the rarest of children who are incorrigible can spend life in prison, discerning who is subject to this extreme punishment is arduous, if not unfeasible. While RCW 10.95.030(3)(b) required sentencing courts to consider youth's chances of becoming rehabilitated, courts face extreme difficulty in making that determination. Even expert psychologists confront impossibility when differentiating between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. Although the Supreme Court did not declare such, this observation should render any life sentence, regardless of availability of release, unconstitutional. A judge can only issue imprecise

and subjective judgments regarding transient immaturity and irreparable corruption. The same factor that one sentencing judge might consider material in releasing the juvenile offender could lead another judge to consider the offender incorrigible and unrehabilitated and not amenable to release.

The Washington Supreme Court, in *State v. Bassett*, observed that, even if it applied the *Fain* proportionality test, it would still find that sentencing a juvenile offender to life without parole violated article I, section 14. Undoubtedly, aggravated first degree murder formed the most serious criminal offense. The legislature, in RCW 10.95.030, announced the purpose of requiring sentencing courts to "take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller*." LAWS OF 2014, ch. 130, § 9(3)(b). Thus, the first two factors warranted a serious punishment for aggravated murder. The third factor, the punishment juveniles would receive in other jurisdictions, weighed in favor of finding juvenile life without parole sentences to be cruel punishment and unconstitutional. Lastly, the fourth factor directed the court to look at the punishment juveniles would receive for other offenses in the same jurisdiction. Juveniles in Washington could be sentenced to life without parole only if convicted of aggravated first degree murder. RCW 10.95.030. If a juvenile was convicted of any other crime or combination of crimes, he or she would be eligible for release after 20 years, unless he or she has committed a disqualifying infraction in the prior year. RCW 9.94A.730(1). The punishment was extreme in comparison to the sentence Washington would impose for other crimes. Thus, life without parole was a

disproportionate sentence for juvenile offenders rendering unconstitutional under article I, section 14. The court remanded sentencing back to the superior court for resentencing in light of Bassett's immaturity at the time of his murders. Remember that, although Lyle Roetcisoender committed an egregious crime, he did not commit murder.

Although I conclude that Lyle Roetcisoender's life sentence should end, Roetcisoender also asks for resentencing before the superior court. As a result of *State v. Houston-Sconiers*, the requisite sentencing hearing for a juvenile in adult court, under Washington jurisprudence, is no longer an ordinary sentencing proceeding. *State v. Ramos*, 187 Wn.2d 420, 443, 387 P.3d 650 (2017). *Miller v. Alabama* establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The court must receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's chronological age and its hallmark features of immaturity, impetuosity, and failure to appreciate risks and consequences. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The sentencing court must also consider the juvenile's family and home environment, the circumstances of the offense, the extent of the offender's participation in the conduct, and the way familial and peer pressures may have affected him. *State v. Ramos*, 187 Wn.2d 420, 443-44 (2017).

Trial courts possess complete discretion to weigh the *Miller* factors. *Houston-Sconiers*, 188 Wn.2d 1, 21 (2017). This discretion does not, however, mean no review of the sentencing court's application of mitigating factors. *State v. Haag*, 198 Wn.2d 309, 326, 495 P.3d 241 (2021). A trial court lacks the discretion to impose a standard range sentence, let alone an upward exceptional sentence, without first considering the mitigating circumstances of youth when the defendant committed the crime as a juvenile. *In re Personal Restraint of Ali*, 196 Wn.2d 220, 231–33, 474 P.3d 507 (2020); *State v. Backstrom*, 15 Wn. App. 2d 103, 106–07, 476 P.3d 201 (2020).

Aggravating factors, including a defendant's criminal history, his academic delinquency, and his probation violations must be considered in a different light. *People v. Johnson*, 2020 Il. App (3d) 130543,-B, 171 N.E.3d 936, 942, 446. Ill. Dec. 831. The sentencing court must filter those factors through the lens of youth and the specific propensities that come with immaturity. *People v. Johnson*, 2020 Il. App (3d) 130543,-B, 171 N.E.3d 936, 942.

According to the United States Supreme Court, retribution cannot take precedence in juvenile sentencing. *Miller v. Alabama*, 567 U.S. 460, 472 (2012); *State v. Haag*, 198 Wn.2d 309, 321 (2021). Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution lessens with a minor as with an adult. *Graham v. Florida*, 560 U.S. 48 (2010); *State v. Haag*, 198 Wn.2d 309, 321 (2021).

The 1988 sentencing court emphasized the need for retribution because of the hideous nature of Lyle Roetcisoender's crimes. Thus, the superior court sentenced

Roetcisoender as an adult without meaningfully considering his youth and his individualized lack of development. Rather than using discretion to sentence below the standard range of 62 to 82 months, the court imposed an exceptional sentence of life based on factors that a jury must now determine but did not determine then.

The Kittitas County sentencing court committed legal error. A meaningful consideration of Lyle Roetcisoender's age and maturity would likely lead to a lower sentence. Roetcisoender was not only under age, but his mental capacity was even lower than his chronological age. All mental health professionals concluded that Roetcisoender's crimes resulted from his immaturity, impetuosity, and failure to appreciate risks and consequences.

Some mental health professionals opine that Lyle Roetcisoender does not acknowledge the harm he caused to T.J. and her family based in part on his low intelligence and difficulty in socializing. Nevertheless, Roetcisoender testified that he immediately regretted his actions and attempted to give CPR to the victim before fleeing. Police reported that Roetcisoender wept and became distraught when asked about the condition of T.J., and law enforcement noted that Roetcisoender had previously argued with his mother, which could have set his mood for the day. Roetcisoender's frequent denial of wrongdoing may result from his low intelligence.

If the sentencing court had afforded Lyle Roetcisoender the protection granted under the United States and Washington State Constitutions, the court may have granted a downward exceptional sentence. If the court had knowledge of brain growth and

40

adhered to Washington and United States Supreme Court precedent, the court probably would have granted a sentence on the low end of the standard range.

I earlier suggested that the categorical bar analysis adopted in *State v. Bassett* may demand the current release of Lyle Roetcisoender. The same factors and reasoning that preclude a life without parole sentence and invalidated one provision in RCW 10.95.030 demand the release. Roetcisoender has reached age 53. His sentence, now thirty-seven years and persisting, has matured into a life sentence. Nothing in *State v. Bassett* restricts its holding to *statutorily* mandatory life without parole sentences. *State v. Anderson*, 200 Wn.2d 266, 296, 516 P.3d 1213 (2022) (Gonzalez, C.J., dissenting). *Bassett* held that, under article I, section 14 of our constitution, any life-without-parole sentence for a juvenile offender is unconstitutional. *State v. Anderson*, 200 Wn.2d 266, 296 (2022) (Gonzalez, C.J., dissenting). The decision's reasoning extends to any life spent in prison by a juvenile offender regardless of whether the sentence results from a mandatory sentence or a never-ending indeterminate sentence. *State v. Bassett* created no exception to the prohibition on a life sentence for those unrehabilitated. The nature of a life sentence for a juvenile remains cruel no matter the type or characteristics of the sentence imposed and no matter if the offender remains unremorseful, difficult, troubled, and naughty. A life sentence remains cruel regardless if the offender enjoys the opportunity for parole if he obeys prison staff.

As hinted in the previous paragraph, by demanding that Lyle Roetcisoender gain release permission from the ISRB, the State in essence imposes a de facto life sentence

on Roetcisoender. In *Sam v. State*, 2017 WY, 98, 401 P.3d 834 (Wyo. 2017), the Wyoming high court ruled that a sentence imposed on Phillip Sam of a minimum fifty-two years with possible release at age seventy constituted a de facto life sentence. In *Bear Cloud v. State*, 2014 WY, 113, 334 P.3d 132 (Wyo. 2014), the same western court adjudged a sentence of a minimum of forty-five years, with possible release at age sixty-one, as the functional equivalent of life without parole. In *State v. Williams-Bey*, 167 Conn. App. 744, 144 A.3d 467 (2016), the court remanded for a new hearing a sentence that would not release a juvenile offender convicted of murder until age fifty-two.

Most courts that have considered the issue agree that a lengthy term of years for a juvenile offender will become a de facto life sentence at some point. *Casiano v. Commissioner of Corrections*, 317 Conn. 52, 115 A.3d 1031 (2015). The United States Supreme Court viewed the concept of "life" in *Miller* and *Graham* more broadly than biological survival and implicitly endorsed the notion that an individual is effectively incarcerated for life if he will have no opportunity to truly reenter society or have any meaningful life outside of prison. *Casiano v. Commissioner of Corrections*, 115 A.3d 1031, 1047 (2015). The Supreme Court's *Miller* decision intended to allow juvenile offenders the opportunity to live a part of their lives in society, not simply to leave prison in order to die. *State v. Moore*, 149 Ohio St. 3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, 1137.

Washington follows the majority view. In *State v. Ramos*, 187 Wn.2d 420 (2017), our high court wrote:

> [Similarly,] we also reject the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences. Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same.

*State v. Ramos*, 187 Wn.2d 420, 438-39 (2017). Also, *Bassett* held that, under article I, section 14 of our constitution, any life-without-parole sentence for a juvenile offender is unconstitutional even if by a de facto imposition. *State v. Anderson*, 200 Wn.2d 266, 296 (2022) (Gonzalez, C.J., dissenting).

Two Washington decisions compel the release of Lyle Roetcisoender from incarceration because of his decades in prison. In *State v. Ronquillo*, 190 Wn. App. 765, 361 P.3d 779 (2015), this court deemed a 51.3-year sentence for murder and other violent, gang-motivated crimes as a de facto life sentence. The sentence contemplated Brian Ronquillo remaining incarcerated until the age of 68. This court deemed the de facto life sentence to have impermissibly categorized Ronquillo as irredeemable, a characterization inconsistent with *Miller v. Alabama*. Before a court can sentence a youth offender to a functional equivalent of a life sentence, the court must consider how children are different and assess whether the offender was irrevocably corrupt. This court

43

remanded to the superior court to resentence Ronquillo, who committed the crimes at age sixteen.

The most compelling decision in the context of Lyle Roetcisoender's petition is *State v. Haag*, 198 Wn.2d 309 (2021). Timothy Haag experienced a troubled upbringing. In 1994, Haag, at age 17, killed a seven-year-old neighbor girl. A jury convicted Haag of first degree aggravated murder. The superior court then sentenced him to mandatory life without parole. In 2018, the superior court resentenced Haag under the *Miller*-fix provisions of RCW 10.95.030 and .035. After the hearing, the resentencing court found that Haag was not irretrievably depraved or irreparably corrupt. Nevertheless, after hearing from the victim's family of the need to keep a child killer behind bars and that such a man is incapable of reform, the superior court resentenced Haag to forty-six years to life. The resentencing court mentioned that Haag, weighing three hundred pounds at the time of the homicide, strangled a sixty-five-pound defenseless child during a heinous multi-step strangulation. With the resentence, the earliest release date for Haag was age 63.

On appeal to the Supreme Court, the court reversed Timothy Haag's resentencing because the superior court emphasized retribution over mitigation. RCW 10.95.030 demands that the sentencing court place greater emphasis on mitigation factors than on retributive factors. The court repeated the presumption that youth possess diminished culpability. Only the rare offender is irreparably corrupt. The court also characterized the first possible release date of age 63 as comprising a de facto life sentence. A

minimum sentence of forty-six years also constituted a de facto life sentence. Article I, section 14 and *Miller* applies to juvenile homicide offenders facing de facto life sentence not just literal life without the opportunity of parole sentences. The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a meaningful opportunity to demonstrate the maturity and rehabilitation required to obtain release and reenter society as required by *Graham v. Florida*.

Lyle Roetcisoender's case differs from Timothy Haag's case because Roetcisoender has failed to show the growth that Haag experienced in a correctional system. Experts worry about public safety if Roetcisoender is released. Still, *Haag* shows that Roetcisoender is now serving a de facto life sentence without any court having determined that he was irreparably depraved when he committed the crime in 1987. The State will not even agree to a resentencing during which Roetcisoender could present his own expert witnesses for review by the court. Roetcisoender has yet to benefit from the requirement that a judge determining release must focus on the mitigating factors of youth.

The most egregious facts presented by a particular case cannot automatically negate a juvenile homicide offender's right to resentencing under the *Miller* factors. *State v. Ramos*, 187 Wn.2d 420, 438 (2017). Instead, all doubts should be resolved in favor of conducting a *Miller* hearing.

Assuming Lyle Roetcisoender to be unrehabilitated, Washington's criminal justice system, by sentencing him as an adult to an adult prison, shares blame with

45

Roetcisoender for any failure to reform. Imprisonment results in a traumatic and dangerous existence, not a learning and maturation experience. Washington State has only recently adopted other state and national efforts to reform policies that incarcerate youth and young adults in the adult criminal system. *State v. Reynolds*, 2 Wn.3d 195, 218, 535 P.3d 427 (2023) (Whitener, J., dissenting). In 2019, the Washington State Legislature wrote:

> The legislature acknowledges that transferring youth and young adults to the adult criminal justice system is not effective in reducing future criminal behavior. Youth and young adults incarcerated in the adult criminal justice system are more likely to recidivate than their counterparts housed in juvenile facilities.

LAWS OF 2019, ch. 322, § 1. Lyle Roetcisoender entered the prison system at age sixteen and has remained incarcerated since.

I have not performed an exhaustive study of other sentences imposed on offenders convicted of first degree kidnapping, but a number of recent examples suffice. In *State v. Stone*, No. 38808-5-III (Wash. Ct. App. Apr. 4, 2024) (unpublished), *review denied*, 3 Wn.3d 1016 (2024), Kenneth Stone pled guilty to second degree murder in exchange for the State dismissing a first degree kidnapping charge. In honoring the agreement, the court sentenced Stone to 254 months' confinement to be served concurrent with a federal sentence. In *State v. Roberts*, No. 56435-1-II (Wash. Ct. App. Feb. 22, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056435-1-II%20Unpublished%20Opinion.pdf, *review denied*, 1 Wn.3d 1021 (2023), the court sentenced Jeffrey Roberts to 130 months for first degree kidnapping. In *State v. Smith*,

46

No. 54296-0-II (Wash. Ct. App. Mar. 15, 2022) (unpublished), the trial court sentenced Eddie Smith to 149 months for first degree kidnapping plus 24 months for a deadly weapon sentencing enhancement. Finally, in *State v. Herrera-Castro*, No. 35288-0-III (Wash. Ct. App. Jan. 17, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/352889_unp.pdf, the court imposed on Alejandro Herrera-Castro a sentence, the court imposed on Alejandro Herrera-Castro a sentence of 164 months for three convictions of first degree kidnapping, not including weapon enhancements.

Court decisions fail to mention that incarceration decreases one's life expectancy. Michael Massoglia & William Alex Pridemore, *Incarceration and Health*, 41 ANN. REV. SOCIO. 291 (2015). According to a study conducted by Vanderbilt University and data from New York, for every year spent behind bars, overall life expectancy decreases two years. Evelyn J. Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 AM. J. PUB. HEALTH 523 (2013); Nick Straley, *Miller's Promise: Re-Evaluating Extreme Criminal Sentences for Children*, 89 WASH. L. REV. 963, 986 n.142 (2014).

Washington releases someone convicted of kidnapping or even of murder who has served less than the thirty-seven year sentence Lyle Roetcisoender has served without the offender proving he or she will unlikely recidivate. The State and the majority have no qualms of keeping Roetcisoender caged for the rest of his life for a kidnapping because he cannot, because of his low intelligence, show he will not commit another crime.

47

I previously wrote that Lyle Roetcisoender should be released now. But assuming no current release, the law at least demands a meaningful resentencing before a superior court.

As a result of *State v. Houston-Sconiers*, the requisite sentencing hearing for a juvenile in adult court, under Washington jurisprudence, is no longer an ordinary sentencing proceeding. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). *Miller v. Alabama* establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The court must receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony, as appropriate. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's chronological age and its hallmark features of immaturity, impetuosity, and failure to appreciate risks and consequences. *State v. Ramos*, 187 Wn.2d 420, 443 (2017). The sentencing court must also consider the juvenile's family and home environment, the circumstances of the offense, the extent of the offender's participation in the conduct, and the way familial and peer pressures may have affected him. *State v. Ramos*, 187 Wn.2d 420, 443-44 (2017).

----------

The State seeks dismissal of Lyle Roetcisoender's personal restraint petition based on restrictors imposed by statute and court rule for relief by way of collateral attack. The

State asks us to deny the personal restraint petition because Roetcisoender did not file the petition within one year of the finality of his judgment, because Roetcisoender purportedly enjoys another sufficient remedy to the unconstitutional sentence, and because Roetcisoender establishes no prejudice. I first discuss the time bar.

Lyle Roetcisoender filed his personal restraint petition more than one year after the finality of his conviction. RCW 10.73.090 imposes a one-year time limit for the filing of a personal restraint petition. The statute declares:

> (1) No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence *is valid on its face* and was rendered by a court of competent jurisdiction.

(Emphasis added.)

A related statute, RCW 10.73.100, grants seven exceptions to the one-year time bar, one of which is a change in law. This latter statute reads in pertinent part:

> The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds:
> …
> (7) There has been *a significant change in the law, whether substantive or procedural*, which is material to the conviction, sentence, or other order entered in a criminal or civil proceeding instituted by the state or local government, and either the legislature has expressly provided that the change in the law is to be applied retroactively, or a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require retroactive application of the changed legal standard.

(Emphasis added.)

The statutory exception found in RCW 10.73.100(7) requires that the change in law apply retroactively. The retroactive application extends to both procedural and substantive changes in the law. The statute does not require that the collateral attacker file his motion or petition within one year of the significant change in law.

The opening statute, RCW 10.73.090, only bars a collateral attack more than one year after a judgment becomes final when "the judgment and sentence is valid on its face." RCW 10.73.090(1). A judgment may be facially invalid due to constitutional defects. *In re Personal Restraint of Goodwin*, 146 Wn.2d 861, 866, 50 P.3 618 (2002). A judgment is constitutionally invalid on its face if it evidences the invalidity without further elaboration. *In re Personal Restraint of Goodwin*, 146 Wn.2d 861, 866 (2002). The face of Lyle Roetcisoender's judgment and sentence imposed a life sentence on a youth. The categorical bars announced in *State v. Bassett* and *Graham v. Florida* may declare the sentence invalid on its face, but Roetcisoender has not briefed this question. The judgment and sentence did not list Roetcisoender's birthdate such that the reader could tell on the sentence's face of an unconstitutional sentence imposed on a teenager. Roetcisoender need not rely, however, on facial invalidity to survive RCW 10.73.090.

Lyle Roetcisoender asserts the change of law exception found in RCW 10.73.100(7). *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), on which Roetcisoender substantively relies, represents a significant and material change in the law that applies retroactively, exempting Roetcisoender's petition from the one-year time bar under RCW 10.73.100. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 259,

474 P.3d 524 (2020). The demands of *Houston-Sconiers* apply retroactively and a juvenile defendant is actually and substantially prejudiced when a sentencing court fails to "meaningfully consider" the defendant's youth. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255 (2020). Roetcisoender's 1988 sentencing court violated the teachings of *Houston-Sconiers* when meting a sentence exceeding the adult standard range and failing to meaningfully consider Roetcisoender's age.

State v. Bassett, on which Lyle Roetcisoender also depends, heralded a watershed change in the law. Finally, in *Montgomery v. Louisiana*, the United States Supreme Court ruled that the teachings of *Miller v. Alabama* applied retroactively.

The State observes that the Washington Supreme Court has divided the ruling in *Houston-Sconiers* into a procedural wedge and a substantive tranche. The court has stated that only the substantive aspect of *Houston-Sconiers* applies retrospectively. Finally, the State contends that Lyle Roetcisoender only relies on the procedural facet of *Houston-Sconiers*.

In 2020, the Washington Supreme Court, in companion cases *In re Personal Restraint of Ali*, 196 Wn.2d 220 (2020) and *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255 (2020) addressed whether the requirements of *Houston-Sconiers* apply retroactively on collateral review. The court held that *Houston-Sconiers* constituted a significant and material change in the law that required retroactive application. Thus, a personal restraint petitioner could raise a *Miller* and *Houston-Sconiers* violation despite filing the petition more than one year after sentencing.

51

Nothing in either *Ali* or *Domingo-Cornelio* suggests that any of the rulings in *Houston-Sconiers* did not enjoy retroactive effect. In *In re Personal Restraint of Ali*, the Washington high court applied retroactively all components of the *State v. Houston-Sconiers* ruling to offenders such as Lyle Roetcisoender, sentenced before issuance of the Supreme Court's decision in *Houston-Sconiers*. *Houston-Sconiers* followed *Miller v. Alabama* and its progeny, which centered on the substantive guaranty of the Eighth Amendment: punishment proportionate to culpability. To that end, the court must, on a showing of prejudice, resentence the offender and, on resentencing, consider all mitigating circumstances related to the defendant's youth.

In steps that thwart the promise of *Miller v. Alabama*, the Washington Supreme Court has since characterized *Houston-Sconiers* as entailing procedural and substantive aspects. In turn, the state high court has limited retroactivity to the substantive ruling in *Houston-Sconiers*, despite RCW 10.73.100(6) referencing both procedural and substantive changes in the law as being retroactive.

The Washington Supreme Court, in *In re Personal Restraint of Forcha-Williams*, 200 Wn.2d 581, 520 P.3d 939 (2022), dissected the *Houston-Sconiers* ruling into one substantive rule that bars standard adult SRA ranges as being disproportionate punishment for juveniles who possess diminished capacity. In turn, the high state court identified and separated from the substantive rule two *Houston-Sconiers* procedural rules. First, sentencing courts must consider the mitigating qualities of youth. Second, courts must possess discretion to impose sentences below what the SRA mandates. The court

52

characterized a procedural *Houston-Sconiers* violation as not necessarily causing the offender prejudice.

In response to Lyle Roetcisoender's personal restraint petition, the State argues that *In re Personal Restraint of Forcha-Williams* held that a procedural *Houston-Sconiers* violation is not subject to retroactivity. But the Supreme Court did not venture that far. The Supreme Court instead, in a 5 to 4 ruling, only declared that a procedural violation does not constitute per se prejudice. *Forcha-Williams* did not hold that a procedural violation cannot be applied retroactively. The Supreme Court dismissed Derrius Forcha-Williams' personal restraint petition because, despite the State conceding *Houston-Sconiers* procedural violations, Forcha-Williams failed to establish that, if the sentencing court had considered the *Miller* mitigating factors and exercised its unlimited discretion, it would have imposed a lower sentence. In part, the Supreme Court relied on the harsh words uttered by the superior court during the sentencing hearing and the court having mentioned Forcha-Williams' youth as suggesting a resentencing would not change the outcome.

Assuming *In re Personal Restraint of Forcha-Williams* stood for the principle that procedural rules arising from *Houston-Sconiers* do not survive the one-year time bar, the majority ruling must be criticized. The symbiotic procedural and substantive aspects of *Houston-Sconiers* do not subsist without one another. The procedural aspect of the decision lacks any importance but for the substantive aspect of gaining a lower sentence. Unless the petitioner relies on a categorical bar such as the bar from *State v. Bassett*, the

53

substantive aspect cannot be fulfilled without the procedure of reviewing evidence of

immaturity and possessing discretion to resentence based on juvenile immaturity. Under

state law, courts do not usually apply a new procedural rule retroactively. But, if a

substantive constitutional rule coincides with a crucial procedural mechanism that

implements that substantive rule, that procedural mechanism must also apply

retroactively. *In re Personal Restraint of Ali*, 196 Wn.2d 220, 240 (2020).

The four dissenters, in *In re Personal Restraint of Forcha-Williams*, observed that

the majority strayed from the court's decision, in *In re Personal Restraint of Domingo-*

*Cornelio*, that a PRP petitioner shows actual and substantial prejudice by identifying a

violation of only one of the *Houston-Sconiers* mandates. In fact, the dissent in *Domingo-*

*Cornelio* had faulted the majority for recognizing the importance of both of the dual

mandates. The dissent, in *Forcha-Williams*, also concluded that Derrius Forcha-Williams

showed prejudice because, although the resentencing court referred to Forcha-Williams

as a young man, the court never explored the implications of Forcha-Williams'

immaturity, impetuosity, and inability to understand risks.

*In re Personal Restraint of Carrasco*, 1 Wn.3d 224, 525 P.3d 196 (2023)

followed *In re Personal Restraint of Forcha-Williams*. Erik Carrasco Ramos served a

93-year sentence imposed in 2012 without any consideration of his youth. In April 2010,

while a gang member and at the age of 17, he committed second degree murder, four

counts of first degree assault, and second degree unlawful possession of a firearm. In

2018, Carrasco filed a personal restraint petition that sought resentencing. The Supreme

Court accepted the State's contention that Carrasco enjoyed an alternative remedy to
resentencing under RCW 9.94A.730(1) due to the statutory presumption of release by the
ISRB after serving twenty years of confinement.  In doing so, the court followed *Forcha-
Williams'* distinction between the procedural and substantive aspects of *Houston-
Sconiers*.

Three dissenters in *In re Personal Restraint of Carrasco* wisely criticized the
attempt to distinguish between the procedural requirements and substantive requirements
of *Houston-Sconiers*.  Both requirements must be applied retroactively because the two
intertwine.  A court cannot determine whether a youth offender's sentence substantively
violates the cruel punishment clause without engaging in the procedure of analyzing
the *Miller* factors and then exercising discretion to resentence the youth.  The procedures
of reviewing the *Miller* factors and exercising resentencing discretion serve no purpose
except to enforce the promises and protections of the cruel punishment clause.  *Houston-
Sconiers* never separated its rulings into distinct categories for purposes of retroactivity.

The recent decisions in *In re Personal Restraint of Carrasco* and *Personal
Restraint of Forcha-Williams* created a befuddling set of rules divorced from reality that
preclude many juvenile offenders from resentencing hearings.  As one commentator
noted, the recent Washington decisions complete the annihilation of the *Miller* promise
by erecting a time bar, imposing a sophistic distinction between procedural and
substantive challenges, and narrowly viewing prejudice.  Atif Rafay, *Evading Haag: How*

*Courts Deny That Imprisoning Teens for Life Without Possibility of Parole Is Cruel*, 21 SEATTLE J. FOR SOC. JUST. 731 (2023).

The erroneous rulings in *In re Personal Restraint of Carrasco* and *In re Personal Restraint of Forcha-Williams* do not harm Lyle Roetcisoender. Despite the imperative of this intermediate appellate court following Washington Supreme Court precedent, the State fails to recognize that Roetcisoender, although accusing his sentencing court of violating the procedures established in *Houston-Sconiers*, principally relies on the substantive rule announced in *Houston-Sconiers*. Roetcisoender's 1988 sentencing court breached the cruel punishment clause when imposing a standard adult sentence and a de facto life sentence on a juvenile with diminished capacity.

Lyle Roetcisoender's argument also relies on the new substantive principle announced in *State v. Bassett*, 192 Wn.2d 67 (1998) that imposing a life sentence on a youth without a finding of irreparable depravity constitutes cruel punishment. The *Bassett* rule, as a substantive rule, must also apply retroactively in favor of Roetcisoender. Finally, Roetcisoender relies on a combination of the *Bassett* and *Houston-Sconiers* substantive rulings to the effect that he need not show rehabilitation in order to gain release from prison.

In *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the high Court readdressed the subject of life without parole sentences for juvenile homicide offenders. *Montgomery* held that *Miller* applied retroactively to offenders who were juveniles when they committed their crimes. Against contentions that the *Miller* ruling only imposed a

procedure for resentencing, the Court later announced that *Miller* established a

substantive rule that juveniles, whose crimes reflect "only transient immaturity" and who

have since matured, will not be forced to serve a life without parole sentence.

*Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016).

The State seeks to defeat Lyle Roetcisoender's motion by forwarding the

availability of an alternative remedy. A court will grant relief by a personal restraint

petition only if other remedies available to the petitioner are inadequate under the

circumstances. RAP 16.4(d). The State argues that Washington's *Miller*-fix

statute, RCW 9.94A.730, affords an adequate remedy because it allowed Roetcisoender

to petition for early release after serving twenty years of his lifetime sentence. To repeat,

RCW 9.94A.730 declares:

> (1) Notwithstanding any other provision of this chapter, *any person convicted of one or more crimes committed prior to the person's eighteenth birthday* may petition the *indeterminate sentence review board* for early release after serving no less than twenty years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's eighteenth birthday, the person has not committed a disqualifying serious infraction as defined by the department in the twelve months prior to filing the petition for early release, and the current sentence was not imposed under RCW 10.95.030 [aggravated first degree murder] or 9.94A.507 [certain sex offenders].(3) . . . The board shall order the person released under such affirmative and other conditions as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, *it is more likely than not that the person will commit new criminal law violations if released*. The board shall give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release

(6) An offender whose petition for release is denied may file a new petition for release five years from the date of denial or at an earlier date as may be set by the board.

(Emphasis added.)

The State asserts that RCW 9.94A.730 remedies all attacks against an unlawful adult sentence. But no Washington case holds that the statute repairs all methods and natures of attacks against an unlawful youth sentence. The State also relies on two recent Washington decisions: *In re Hinton*, 1 Wn.3d 317, 525 P.3d 156 (2023) and *In re Personal Restraint of Carrasco*, 1 Wn.3d 224 (2023). In the two 2023 opinions, the Washington Supreme Court ruled that RCW 9.94A.730 affords an adequate remedy to the petitioners' lengthy adult sentences since the statute converted their determinate sentences to indeterminate sentences and was available specifically to juvenile offenders that were sentenced as adults.

Lyle Roetcisoender responds that the remedy found in RCW 9.94A.730 is neither available nor adequate for him. He adds that his petition seeks substantive relief because he challenges the life sentence under the categorical bar found in *State v. Bassett*, an argument unrelated to RCW 9.94A.730.

Lyle Roetcisoender first contends that RCW 9.94A.730 is no longer "available" to him because he must wait another four years to petition the ISRB for redress after the Board denied his 2022 petition. According to RCW 9.94A.730(6), an individual denied relief may only petition again five years from the date of denial or at an earlier date as may be set by the board. Presumably, when one suffers an unconstitutional action by the

government, one should not need to wait for years in order to obtain redress. In both

*Hinton* and *Carrasco*, the petitioners had yet to petition the ISRB under RCW 9.94A.730.

Roetcisoender may not avail himself of the process prescribed in RCW 9.94A.730 until at

least July of 2026. I rely on another basis for concluding Roetcisoender lacks an

adequate alternative remedy.

Second, Lyle Roetcisoender argues that RCW 9.94A.730(8) does not afford him a

complete remedy. The statute allows the ISRB, if it grants an offender release, to return

the offender to prison for the remainder of the court-imposed term of incarceration if he

violates any conditions of community custody. Because the 1988 sentencing court

imposed a life sentence, Roetcisoender, if released, would face an unlawful lifetime

jurisdiction. According to Roetcisoender, he has always been entitled to a sentence other

than lifetime. A hearing under RCW 9.94A.730 cannot remedy the wrong of lifetime

supervision. As the argument proceeds, an incomplete remedy comprises an inadequate

remedy. I also do not rely on this second argument because it harnesses speculation. The

ISRB determines the length of supervision, which need not match the remainder of the

"the court-imposed term of incarceration." RCW 9.94A.730(6). Once the supervision

period concludes, the ISRB's jurisdiction ends, and the offender can only be "returned to

the institution at the discretion of the board if the offender is found to have violated a

condition of community custody." RCW 9.94A.730(8).

Third, Lyle Roetcisoender maintains that his 1988 judgment and sentence is

invalid on its face such that the ISRB reviewing the sentence serves no purpose. The

legislature authorized the ISRB to determine whether an offender may return safely to the community, but Roetcisoender does not attack the sentence because he shows he may return safely. He attacks the validity of the sentence from its beginning, because under cruel punishment principles, a juvenile cannot receive a life sentence even for aggravated first degree murder. The ISRB lacks authority to determine the constitutionality of Roetcisoender's sentence. Also, according to Roetcisoender, his 1988 sentence fails because the sentencing court failed to consider the *Miller* factors as demanded in by *State v. Houston-Sconiers*, and RCW 9.94A.730 does not permit the ISRB to review the *Miller* factors.

The Washington Supreme Court's recent decision, in *State v. Carter*, 3 Wn.3d 198, 548 P.3d 935 (2024), illustrates the Kafkaesque senselessness of demanding that Lyle Roetcisoender undergo review by the ISRB rather than receive a resentencing based on the *Miller* factors before the superior court. In *Carter*, a consolidation of two resentencings, the Supreme Court affirmed two superior court judges respective shortening of sentences from life without parole to sentences shorter in length than the sentence already served by Roetcisoender. The two offenders, Kimonti Dennis Carter and Shawn Dee Reite, each committed egregious murders. Carter was eighteen years old. Reite was twenty. Juries convicted each of aggravated first degree murder. The respective superior court judges thoroughly reviewed the *Miller* factors and determined that those factors warranted a substantial reduction in the sentence. This court's decision

60

precludes Lyle Roetcisoender, who committed a less severe crime at a younger age, from receiving the same benefit of a superior court hearing under the *Miller* factors.

Although I agree with Lyle Roetcisoender's *Miller* factors second contention, I conclude that *In re Hinton* and *In re Personal Restraint of Carrasco* preclude the contention. One may distinguish the duo of 2023 decisions because both petitioners had yet petitioned for release from the ISRB under RCW 9.94A.730. Roetcisoender already petitioned the ISRB and failed. He at least temporarily has not other remedy to correct his unlawful sentence, including the failure of his sentencing court to consider the *Miller* factors.

I agree with Lyle Roetcisoender's assertion that he lacks an adequate remedy before the ISRB because he not only challenges his sentence because of the sentencing court's failure to apply the *Miller* factors, but because the law demands the immediate erasure of the unconstitutional life sentence. RCW 9.94A.730 does not authorize the ISRB to grant relief from a sentence invalid under the cruel punishment clause. RCW 9.94A.730 does not require or ask the ISRB to consider the *Miller* factors when addressing an offender's request for release. RCW 9.94A.730(3) charges the ISRB to determine whether "it is more likely than not that the person will commit new criminal law violations if released." The statute further directs the ISRB to incorporate methodologies recognized by experts in the prediction of dangerousness and to give public safety considerations the highest priority. Whereas public safety is a worthy goal, public safety does not justify an unconstitutional sentence.

In *State v. Ramos*, 187 Wn.2d 420, 436 (2017), the Washington Supreme Court held that an eventual petition for relief under RCW 9.94A.730 did not render a defendant's appeal moot. The court reasoned that the possibility of another remedy in the future cannot displace a defendant's right to appeal when court did not lawfully impose the sentence in the first instance. Although *Ramos* concerned relief on direct appeal, Lyle Roetcisoender argues the same principle applies on collateral attack, especially when he, in 1988, could not successfully argue the principles found *Houston-Sconiers* and *Bassett.*

Although I conclude that that *In re Hinton* and *In re Personal Restraint of Carrasco* preclude Lyle Roetcisoender from solely relying on the failure of the sentencing court to apply the *Miller* factors, the two decisions should be criticized, as did the dissenters in the cases. RCW 9.94A.730 does not afford Lyle Roetcisoender an adequate remedy because, unlike a sentencing court, the ISRB need not consider mitigating factors of youth at the time of the offense. In *State v. Houston-Sconiers*, 188 Wn.2d 1, 23 (2017), the Washington State Supreme Court held that trial courts must consider mitigating circumstances related to the defendant's youth before sentencing a juvenile defendant to any adult sentence, let alone a life sentence.

A hearing under RCW 9.94A.730 is not a resentencing. *In re Personal Restraint of Brooks*, 197 Wn.2d 94, 102 (2021). Instead, a hearing for early release under RCW 9.94A.730 looks to the future and focuses on one's likelihood of reoffending. *State v. Delbosque*, 195 Wn.2d 106, 122, 456 P.3d 806 (2020). The statute does not guarantee

62

that the petitioner will be released. *In re Personal Restraint of Brooks*, 197 Wn.2d 94, 102 (2021).

Lyle Roetcisoender's 2022 petition to the ISRB illustrates the unavailability of a remedy for him. The Board failed to recognize the substantive constitutional invalidity of Roetcisoender's life sentence. Both *Hinton* and *Carrasco* affirm that the court, in response to a personal restraint petition, should apply the "substantive rule" of *State v. Houston-Sconiers*. In addition, the ISRB did not weigh the *Miller* factors.

The State also seeks dismissal of Lyle Roetcisoender's petition because Roetcisoender fails to show prejudice. To be awarded relief, a personal restraint petitioner must show, by a preponderance of evidence, actual and substantial prejudice by the constitutional error. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 267 (2020). Roetcisoender must show his initial sentencing more likely than not would have been shorter had the alleged error not occurred. *In re Personal Restraint of Meippen*, 193 Wn.2d 310, 316, 440 P.3d 978 (2019). Actual and substantial prejudice is not limited to circumstances when defense counsel makes an argument not legally available and the sentencing court explicitly states that it cannot deviate from sentencing rules. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 267 (2020).

Lyle Roetcisoender shows prejudice because he now remains in prison under an unconstitutional life sentence. Even if Roetcisoender does not show an immediate right to release, a movant also establishes sufficient prejudice if the sentencing court failed to

consider mitigating factors related to youthfulness. *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255, 268 (2020).

The three dissenters, in *In re Personal Restraint of Carrasco*, 1 Wn.3d 224 (2023), sagely noted the need for trial courts, not the ISRB, to resentence all youth, even those sentenced as an adult. Every personal restraint petitioner shows prejudice when his or her sentencing court failed to sentence under the *Miller* factors and failed to comply with the procedural and substantive mandates of *Houston-Sconiers*. A reviewing court cannot be sure if the original sentence was unconstitutionally disproportionate unless a resentencing court follows the dual mandates of *Houston-Sconiers*.

In *State v. Houston-Sconiers*, 188 Wn.2d 1 (2017), the Washington Supreme Court, without extensive analysis, held that two offenders suffered prejudice even though defense counsel at sentencing argued mitigating factors based on youth. The Washington Supreme Court remanded the two combined cases for resentencing.

In *In re Personal Restraint of Ali*, 196 Wn.2d 220 (2020), the Washington Supreme Court held that the offender demonstrated actual and substantial prejudice. Seventeen-year-old Said Ali committed numerous robberies and a first degree assault. The State requested a high-end standard sentence of 390 months. Ali's defense counsel requested an exceptional downward sentence of ten years. Counsel emphasized that Ali was a young adolescent at the time of the crimes and little would be gained by crushing his hope and spirit by sending him away for two lifetimes, which the State sought. Ali presented letters and testimony from members of his community, who referenced his age,

inexperience, and susceptibility to peer pressure. The sentencing judge ruled that she lacked the discretion to impose an exceptional sentence downward based on those mitigating factors.

In *In re Personal Restraint of Ali*, the Washington Supreme Court held that Said Ali had demonstrated prejudice by a preponderance of the evidence. The sentencing judge imposed 312 months, the minimum sentence she had discretion to impose under the SRA. The high court remanded the case for resentencing. In *In re Personal Restraint of Domingo-Cornelio*, 196 Wn.2d 255 (2020), the Supreme Court also remanded for resentencing because the sentencing judge had ordered the lowest possible sentence within the standard range.

I contrast *State v. Houston-Sconiers* and *In re Personal Restraint of Ali* with *In re Personal Restraint of Meippen*, 193 Wn.2d 310 (2019). In the last case, the state high court held that sixteen-year-old Time Meippen failed to show the likelihood of a lower sentence because the sentencing court imposed a sentence in the high-end of the standard range despite recognizing the court had discretion to order a lower sentence within the standard range. Defense counsel argued for a sentence in the low-end of the standard range because the youth's age prevented him from understanding the full nature of his robbing a store and shooting the clerk. The sentencing court deemed Meippen's actions to be cold and calculated.

The ruling in *Personal Restraint of Meippen* should be criticized. Although Time Meippen's sentencing court held discretion to impose a lower sentence and instead

imposed a higher sentence in the standard range, the sentencing court still lacked any knowledge about juvenile brain development studies that scientists released only after Meippen's sentencing. Reviewing the brain studies should have significantly impacted the sentencing judge if she had sentenced Meippen years later. Just because the sentencing judge imposed a high sentence, despite discretion to the contrary, does not mean the court would not have significantly shortened the sentence after scientific enlightenment, after knowing it must consider the immaturity of the teenager when sentencing, and after understanding it must exercise discretion in possibly granting an exceptional downward sentence. A reading of recent case law could have and should have convinced the sentencing judge that it possessed complete discretion in sentencing based on new data of teenage brain development. On resentencing, the judge would have had available for the first-time instructions from the United States Supreme Court and Washington Supreme Court from the last two decades that impose a mandatory duty on the sentencing court to seriously consider the lack of maturity of a seventeen-year-old when sentencing. I underwent a sea change in attitude toward juvenile sentencing when studying the scientific literature and reading the United States Supreme Court decisions.

Those facts critical to the Washington Supreme Court's denial of Time Meippen's petition are absent in Lyle Roetcisoender's sentencing. Roetcisoender's defense counsel, during the 1988 sentencing, never argued mitigating factors based on youth. Roetcisoender's sentencing court did not impose a high sentence within a standard range. Instead, the court imposed a sentence outside the standard range and the highest sentence

possible for first degree kidnapping. The court did so without any understanding of brain science.

Although not necessary to the granting of Lyle Roetcisoender's personal restraint petition, this court should recognize that the United States Supreme Court's decisions on the eighth amendment's cruel and unusual punishment clause control, not Washington Supreme Court precedent. *Montgomery v. Louisiana*, 577 U.S. 190, 197–98, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016); *Martin v. Hunter's Lessee*, 1 Wheat. 304, 340–341, 344, 4 L.Ed. 97 (1816); *City of Seattle v. Long*, 198 Wn.2d 136, 166, 493 P.3d 94 (2021). In *Montgomery v. Louisiana*, a state court refused to apply retroactively the United States Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The United States Supreme Court reversed the state court and demanded that it apply its precedent retroactively. So too this court may not impose barriers to the application of the rulings in *Miller v. Alabama* and *Montgomery v. Louisiana* regardless of whether that barrier is a time bar, a distinction between a procedural and substantive challenge, an alleged alternative remedy, or a purported failure to show prejudice. United States Supreme Court precedence demands that this court retroactively apply *Miller v. Alabama* to Lyle Roetcisoender's, and state law rules may not interfere in that application.

----------

A unique aspect of this case not found in other Washington reported decisions concerns Lyle Roetcisoender's is intellectual disability. Roetcisoender does not seek

67

abrogation of his life sentence because of this disability.

Lyle Roetcisoender has a low intelligence quotient that apparently dipped even further after incarceration. His special needs increase his risk factors. He cannot effectively communicate, which impedes any treatment. Roetcisoender's cognitive impairment limits his ability to develop insight, experience and understand his emotions, learn from his behavior, problem solve, participate in reciprocal interpersonal relationships, and function independently. Roetcisoender's intellectual disability and mental health infirmities inhibit his ability to appear or be defined as rehabilitated or matured. Roetcisoender demonstrates characteristics akin to an antisocial personality disorder, but medical health professionals cannot assess the extent to which his antisocial thoughts and behaviors result from his low I.Q. or from a genuine disregard for the safety of himself and others. Regardless, Roetcisoender likely does not experience remorse, empathy, or understanding about the seriousness of his conduct. These characteristics will unlikely change with education, treatment, or programming.

As Eighth Amendment jurisprudence forbidding the execution of adolescent offenders developed, the law regarding intellectually disabled defendants followed a parallel track. The United States Supreme Court had allowed execution of the intellectually disabled in 1989, *Penry v. Lynaugh*, 492 U.S. 302, 340, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (plurality portion), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). In *Penry*, the majority recognized that a national consensus against execution of the "mentally retarded" may someday

emerge reflecting the evolving standards of decency that mark the progress of a maturing society, but did not believe such a consensus existed in 1989. *Penry v. Lynaugh*, 492 U.S. 302, 340 (1989). That change came thirteen years later. *Atkins v. Virginia*, 536 U.S. 304 (2002).

The 1988 sentence continues to punish Lyle Roetcisoender thirty-six years later for his immaturity based on his disability. He has served longer than many sentenced to murder. Assuming the community still needs protection from Roetcisoender, the State may undertake precautions other than caging him from age sixteen until the end of his life. The State might even conserve resources by implementing some other methods.

The ultimate value behind the United States Constitution's Eighth Amendment cruel and unusual punishment clause is the affirmation of the dignity of humankind. *Roper v. Simmons*, 543 U.S. 551, 560 (2005); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958). The state must recognize the dignity of even those who commit serious crimes. *Graham v. Florida*, 560 U.S. 48, 59 (2010). For the sake of his dignity, Lyle Roetcisoender deserves and needs more than ending his life in a Washington State prison.

I respectfully dissent.

_____
Fearing, J.

69